Johnny REYNOLDS, et al., Plaintiffs,

v.

ALABAMA DEPARTMENT OF TRANSPORTATION, et al., Defendants.

UNITED STATES of America Plaintiff,

v.

Halycon Vance BALLARD, et al., Defendants,

Alabama State Conference of Naacp Branches, Amicus Curiae.

Nos. CIV. A. 85–T–665–N, 2709–N.

United States District Court; M.D. Alabama, Northern Division.

June 1, 1998.

Robert L. Wiggins, Jr., Ann K. Wiggins, Russell W. Adams, Abigail P. van Alstyne, Kimberly C. Page, Scott Gilliland, and Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Johnny Reynolds, plaintiff, and Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, and Jeffrey W. Brown, intervenor-plaintiffs.

Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for Robert Johnson, intervenor-plaintiff.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams, intervenors.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for Michael Grant, John D'Arville, and Andrew McCullough, intervenors.

Thomas R. Elliott, Jr., Allen R. Trippeer, Jr., Lisa W. Borden, C. Dennis Hughes, London & Yancey, Birmingham, AL, and William H. Pryor, Jr., Attorney General for the State

of Alabama, Montgomery, AL, for Alabama Department of Transportation, Alabama State Personnel Department, Jimmy Butts, in his official capacity as Director for the Alabama Department of Transportation, Halycon Vance Ballard, in her official capacity as Director of the Alabama State Personnel Department, and Fob James, in his official capacity as Governor of the State of Alabama, defendants.

William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, in his official capacity as Governor of the State of Alabama, defendant.

Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, New York, NY, for NAACP Legal Defense and Educational Fund, Inc., amicus.

Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for The Lawyers' Committee for Civil Rights under Law, amicus.

### ORDER

MYRON H. THOMPSON, District Judge.

The narrow but important question confronting the court is whether, in light of two recent United States Supreme Court decisions, *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the United States Congress exceeded its authority in providing for the imposition of 'disparate-impact' liability on the States and their officials under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17. It appears that, with these two decisions, the Supreme Court has unsettled greatly the terrain of eleventh and fourteenth amendment jurisprudence.

### I. BACKGROUND

These two consolidated race-discrimination lawsuits, *Reynolds v. Alabama Dep't of Transp.,* Civil Action no. 85–T–665–N, and *United States v. Ballard, Civil Action no. 2709–N* (previously styled *United States v. Frazer,* but still commonly known today as *Frazer* or the *Frazer* litigation),[1] are now before the court on a motion, filed by the *Reynolds* defendants (hereinafter referred to as merely the defendants), requesting that the court dismiss the disparate-impact claims asserted by the *Reynolds* plaintiffs (hereinafter referred to as merely the plaintiffs).[2] The defendants contend that Congress, in providing for the imposition of disparate-impact liability on the States and their officials under Title VII, exceeded its authority under the eleventh and fourteenth amendments to the United States Constitution.

Briefly, the history of *Frazer* and *Reynolds* is as follows. *Frazer* was an action brought in the late 1960s by the United States against the Alabama State Personnel Department and other State agencies (which later included the Alabama Department of Transportation), in which the United States challenged personnel practices that it contended intentionally discriminated against African–American applicants and employees. The court entered orders prohibiting these practices. *See, e.g., United States v. Frazer,* 317 F.Supp. 1079 (M.D.Ala.1970); *United States v. Frazer,* Civil Action no. 2709–N, 1976 WL 729 (M.D.Ala. Aug.20, 1976). In 1985, plaintiffs Johnny Reynolds and other African–Americans brought the *Reynolds* litigation against the defendants, the Alabama Department of Transportation, the Alabama State Personnel Department, and several State officials, charging, among other things, that, despite the orders entered in *Frazer,* the defendants had continued to discriminate against African–Americans. The plaintiffs advanced claims based on theories of 'disparate treatment' and 'disparate impact,' and based their lawsuit on Title VII.[3] Upon ap-

---

1. *United States v. Frazer* is currently styled *United States v. Ballard* because, after December 4, 1981, Halycon Vance Ballard replaced John S. Frazer as the named defendant in the case.

2. *See* defendants' motion to dismiss disparate impact claims, filed August 27, 1997 (Doc. no.2063).

3. The plaintiffs also based their lawsuit on 42 U.S.C.A. § 1981 and the fourteenth amendment

propriate motion, the court consolidated the *Reynolds* case with the *Frazer* litigation.[4]

In 1994, the *Reynolds* parties entered into a partial settlement that resolved all class-wide issues, *see Reynolds v. Alabama Dep't of Transp.*, 1994 WL 899259 (M.D.Ala. Mar.16, 1994),[5] with the resolution of individual claims to follow. *See Reynolds v. Alabama Dep't of Transp.*, 996 F.Supp. 1156 (M.D.Ala.1998).[6] The court has just completed a six-month trial of some of the individual claims.

The court has previously denied, by order entered September 10, 1997, a motion filed by the defendants to stay the trial on the plaintiffs' individual claims for relief pending resolution of the instant motion. *See Reynolds v. Alabama Department of Transportation*, 976 F.Supp. 1431 (M.D.Ala.1997).[7] For the reasons that follow, the motion to dismiss should also be denied because, as the court concludes, Congress validly abrogated the States' sovereign immunity against disparate-impact claims of discrimination brought under Title VII by private parties.

## II. DISCUSSION

### A.

In their motion to dismiss disparate-impact claims, the defendants seek dismissal of all claims in which the plaintiffs allege that the defendants' various employment practices, policies, or procedures have had a disparate impact on black applicants and employees. As both parties correctly observe, the disparate-impact theory of discrimination pervades the *Reynolds* lawsuit, underlying both

the class-based claims that were resolved by the entry of the 1994 consent decree and the individual claims that were the subject of the recently-completed, approximately six-month-long continuation of the trial.

The defendants agree, however, that because the orders and injunctions in *Frazer* were brought and prosecuted by the United States, their eleventh-amendment challenge does not affect them.[8] The eleventh amendment does not bar suit by the United States against a State. *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779–82 & n. 1, 111 S.Ct. 2578, 2581–82 & n. 1, 115 L.Ed.2d 686 (1991). The United States has nonetheless opted to participate in this aspect of the *Reynolds* litigation because of its obvious interest in defending the constitutionality of the application of Title VII, including disparate-impact liability, to the States.[9]

The plaintiffs, along with the United States in *Frazer*, oppose the defendants' motion both 'substantively,' by contending that the defendants' eleventh-amendment argument lacks substantive merit because it misconstrues Congress's constitutional authority and ignores governing precedent that contradicts its basic premises, and 'procedurally,' by arguing that, based upon the following contentions, the court should not even reach the merits of the defendants' argument: (1) the defendants have waived their right to raise an immunity defense based upon the eleventh amendment at this late stage of the proceedings because they have forsaken myriad opportunities to assert the defense at an earlier juncture; (2) although the defendants seek to portray their argument as 'jurisdic-

---

to the United States Constitution, as enforced by 42 U.S.C.A. § 1983.

4. *See* order, entered July 31, 1992 (Doc. no. 434).

5. Doc. no. 553.

6. Doc. no. 2523.

7. Doc. no. 2087.

8. *See* defendants' brief in support of motion to dismiss disparate impact claims, filed September 30, 1997 (Doc. no. 2138), at 7–8.

9. *Cf.* 28 U.S.C.A. § 2403(a) ("In any action, suit or proceeding in a court of the United States to

which the United States or any agency, officer or employee thereof is not a party, wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The United States shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.").

tional,' and hence unwaivable, because it is grounded on the federalism and comity principles that underlie the eleventh amendment, they in fact level a waivable, 'substantive' challenge that is focused exclusively on the scope of Congress's authority under the fourteenth amendment; and (3) the defendants contractually agreed to refrain from raising their eleventh-amendment defense when they entered into the 1994 consent decree in the *Reynolds* litigation, and this court would deprive the plaintiffs of a property right without compensation if it permitted the defendants to shirk their contractual duties.

Despite the potential merit of the procedural arguments advanced by the plaintiffs and the United States, the court declines to examine whether they militate in favor of denying the defendants' motion, because, as explained more fully below, the court finds that the eleventh-amendment challenge lacks merit and the motion is due to be denied on that basis. Thus, the court will limit its discussion in this order to the substance of the defendants' eleventh-amendment argument.

### B.

■ In support of their motion to dismiss on eleventh-amendment immunity grounds, the defendants rely primarily upon the United States Supreme Court's decision in *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and the analytic framework provided therein for determining whether Congress has properly abrogated the States' sovereign immunity as to particular statutory claims. As the defendants correctly observe, *Seminole Tribe* emphasized that a two-pronged inquiry must be undertaken to decide whether a legislative abrogation is valid. First, the court must ascertain whether Congress unequivocally expressed its intent in the legislation to abrogate eleventh-amendment immunity for the legal claims at issue. *See Seminole Tribe*, 517 U.S. at 55–56, 116 S.Ct. at 1123. Absent such an unequivocal expression of intent, Congress may not be deemed to have constitutionally abrogated the States' sovereign immunity. If this first prong is satisfied, the court proceeds to the second prong

and determines whether Congress acted pursuant to a valid exercise of power when it attempted to abrogate the immunity. *See id.*

In 1972, Title VII was amended to extend its protections against employment discrimination to State and other governmental employees by revising various definitions in the original statute to include such employees, and by eliminating certain exemptions applicable to governmental employers. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 449 n. 2, 96 S.Ct. 2666, 2668 n. 2, 49 L.Ed.2d 614 (1976). The defendants contend that to the extent Congress attempted, in enacting the 1972 amendments, to authorize suits against the States predicated on disparate-impact theories of discrimination, it failed under both prongs of the *Seminole Tribe* test. Regarding the first prong, the defendants assert that Congress did not provide a sufficiently 'unequivocal expression' of its intent to impose liability on the States for disparate-impact discrimination, because this disparate-impact liability was a 'judicially-created theory' that was neither the product of Congressional decision-making nor explicitly mentioned in the 1972 amendments. Regarding the second prong, the defendants maintain that Congress, even if it did intend to subject States to disparate-impact discrimination claims when it enacted the 1972 amendments, exceeded its authority under § 5 of the fourteenth amendment, the only source of power now recognized by the Supreme Court for congressional abrogation of the States' sovereign immunity after *Seminole Tribe*.

■ To be sure, the defendants acknowledge that, even under the *Seminole Tribe*'s stringent two-part test, Congress successfully abrogated the States' eleventh-amendment immunity as to disparate-*treatment* claims of discrimination under Title VII because it properly invoked its power pursuant to § 5 of the fourteenth amendment when it extended Title VII's protections to State employees in the 1972 amendments. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). However, the defendants contend that the same conclusion does not apply to disparate-*impact* claims, which, in contrast to those grounded on a disparate-

treatment theory, do not require proof of intentional discrimination. According to the defendants, under § 5 of the fourteenth amendment, Congress may proscribe only purposeful acts of discrimination, and therefore the imposition of disparate-impact liability on the States is not authorized by that constitutional provision. As a result, the defendants contend, Congress has failed to abrogate validly the States' sovereign immunity as to such claims brought pursuant to Title VII.

1. The First Prong of the *Seminole Tribe* Test

■ The court will first address the defendants' contention that Congress did not satisfy the first prong of *Seminole Tribe* as to disparate-impact claims when it enacted the 1972 amendments to Title VII because it did not expressly state that eleventh-amendment abrogation would extend to such claims. The eleventh amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

U.S. Const. amend. XI. Eleventh-amendment sovereign immunity has been held to apply to suits brought by citizens against their own State and is likewise applicable to cases in which the court's jurisdiction is grounded on the existence of a federal question. *See Idaho v. Coeur d'Alene Tribe,* — U.S. —, —, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997); *Blatchford,* 501 U.S. at 779, 111 S.Ct. at 2581.

As stated, the defendants concede that the Supreme Court held in *Fitzpatrick* that Congress had validly abrogated the States' sovereign immunity in the 1972 amendments, when it concluded that the amendments authorized federal courts to award money damages against a State found liable for employment discrimination. In reaching this decision, the *Fitzpatrick* Court concluded that the 1972 amendments contained the requisite unequivocal expression of congressional intent to abrogate the States' sovereign immunity as to Title VII claims gener-

ally. *See Fitzpatrick,* 427 U.S. at 452, 96 S.Ct. at 2670 (observing that "the 'threshold fact of congressional authorization' ... to sue the State as employer is clearly present.") (quoting *Edelman v. Jordan,* 415 U.S. 651, 672, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974)). Nonetheless, the defendants contend that Congress did not provide in the 1972 amendments a sufficiently clear statement of its intent to abrogate the States' immunity specifically as to claims grounded on a disparate-impact theory of discrimination, as the defendants insist Congress must. This argument, while perhaps enjoying superficial plausibility, cannot withstand closer scrutiny.

As the United States correctly observes, the defendants have failed in their attempt to establish that the 'unequivocal expression' requirement demands more than a clear expression by Congress of its intent to abrogate the States' immunity as to a statute as a whole, that is, also compels Congress to indicate explicitly that its abrogation is meant to encompass claims against States brought pursuant to all potential theories of liability available under the statute. The defendants do not cite, and the court is not aware of, any authority that supports their position that a general statement of intent to abrogate does not include all theories by which liability under the statute may be established.

Moreover, even if it is assumed for the sake of argument that Congress must unequivocally state its intent to abrogate as to specific liability theories, there is ample support for a conclusion that such a requirement would be satisfied here. First, there is nothing in *Fitzpatrick* to suggest that the Supreme Court's conclusion regarding Congress's clear expression of intent to abrogate should not be extended to encompass all theories of liability that are available under Title VII. Especially noteworthy is the fact that none of the numerous provisions that the *Fitzpatrick* Court examined in arriving at its conclusion make reference to a specific theory or theories of liability (*e.g.,* those grounded on disparate treatment, retaliation, or disparate impact), but each is instead a general-applicability provision pertaining to the definition of terms employed in the stat-

ute or the scope of the right to sue under Title VII. *See Fitzpatrick,* 427 U.S. at 449 n. 2, 96 S.Ct. at 2668 n. 2 (examining amendments to §§ 701(a), (b), and (f) of Title VII, as well as § 4(a) of the 1972 amendments). Consequently, there is no legitimate basis upon which to conclude that *Fitzpatrick*'s holding regarding congressional intent is limited to claims alleging disparate-treatment.

In addition, the preceding observation regarding the *Fitzpatrick* Court's analysis of the 1972 amendments must be assessed in conjunction with the fact that in *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), the Supreme Court concluded, on the basis of 'statutory construction,' that Title VII's provisions outlawed "practices, procedures, or tests neutral on their face, and even neutral in terms of intent ... if they operate to 'freeze' the status quo of prior discriminatory employment practices," and therefore that disparate-impact claims of discrimination are available under Title VII. Thus, because the *Griggs* Court interpreted the language employed by Congress in Title VII to provide for disparate-impact liability, disparate-impact liability was not judicially created in 1971 but rather was a product of statutory construction of what the law *is,* and was at the time of passage, and, most importantly, prior to the extension of Title VII to the States with 1972 amendments. *See Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 107, 113 S.Ct. 2510, 2523, 125 L.Ed.2d 74 (1993) (Scalia, J., concurring) (judicial power is "a power 'not delegated to pronounce a new law, but to maintain and expound the old one.' 1 W. Blackstone, Commentaries 69 (1765)."). When this construction of Title VII's statutory language is combined with the *Fitzpatrick* Court's conclusion on the basis of general-applicability definitional and enforcement provisions that the 1972 amendments contained a clear expression of congressional authorization to sue the States as employers, it becomes evident that the statute, as amended in 1972, contains the requisite clear and unequivocal expression of Congress's intent to abrogate the States' sovereign immunity as to disparate-impact claims of discrimination.

Finally, the court notes that this conclusion is not inconsistent with the Supreme Court's rationale for insisting upon a clear and unequivocal statement of congressional intent to abrogate the eleventh amendment. The Court's reasoning was summarized in *Dellmuth v. Muth,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989), as follows:

> "We have stressed ... that abrogation of sovereign immunity upsets the fundamental constitutional balance between the Federal Government and the States, placing a considerable strain on the principles of federalism that inform Eleventh Amendment doctrine. To temper Congress' acknowledged powers of abrogation with due concern for the Eleventh Amendment's role as an essential component of our constitutional structure, we have applied a simple but stringent test: Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute."

*Id.* at 227, 109 S.Ct. at 2400 (quotation marks and citations omitted). Given Congress's clear and unequivocal expression of intent in the statutory language of Title VII to abrogate the States' immunity as to Title VII claims generally, as discerned by the Supreme Court in *Fitzpatrick,* there is no reason why the inclusion of disparate-impact claims within the purview of claims for which the States' immunity has been abrogated would place any additional strain on the federalism principles discussed in *Dellmuth.*

For the foregoing reasons, the court concludes that Congress satisfied the first prong of the *Seminole Tribe* test when it extended Title VII's protections, including those against disparate-impact discrimination, to State employees in the 1972 amendments.

### 2. The Second Prong of the *Seminole Tribe* Test

█ Having concluded that the defendants' argument regarding the first prong of the *Seminole Tribe* inquiry lacks merit, the court turns next to the second prong, under which it must ascertain whether Congress actually had the power to abrogate the States' sovereign immunity from lawsuits

brought on the basis of a disparate-impact theory. As explained below, although this question requires the court to traverse jurisprudential terrain that is subject to frequent and unpredictable tectonic shifts, the court concludes that Congress acted within its authority when it abrogated the States' immunity from disparate-impact claims in the 1972 amendments to Title VII.

■ Both parties correctly observe that after *Seminole Tribe* Congress may now draw upon only one judicially-recognized source of constitutional authority to abrogate the States' eleventh-amendment immunity, namely § 5 of the fourteenth amendment. Section 5, the enforcement provision of the fourteenth amendment, provides:

"The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

U.S. Const. amend. XIV, § 5. And § 1, the substantive provision that underlies § 5, provides as follows:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

U.S. Const. amend. XIV, § 1. The parties' dispute arises over the question of whether Congress exceeded its powers, under § 5, when it attempted to subject the States to liability for disparate-impact claims of discrimination, which, as both parties agree, do not require proof of intentional discrimination.[10] As primary support for their argument, the defendants cite *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), a decision that they maintain establishes unequivocally that Congress's authority under § 5 is limited to the enactment of legislation that proscribes actions reflecting a racially-discriminatory purpose, and that this authority is exceeded when Congress attempts to outlaw actions that result in a racially-disproportionate impact but do not stem from intentional discrimination. The defendants also rely upon a recent district court decision, *Larry v. Board of Trustees of the Univ. of Ala.*, 975 F.Supp. 1447 (N.D.Ala.1997), in which the court found that Congress had exceeded its § 5 powers when it attempted to abrogate the States' immunity for claims brought pursuant to the Equal Pay Act, 29 U.S.C.A. § 206(d)(1), which provides for liability even absent proof of intentional discrimination.

The plaintiffs and the United States counter by citing *Scott v. City of Anniston*, 597 F.2d 897 (5th Cir.1979),[11] a former Fifth Circuit opinion, which they assert to have held

---

**10.** In *Seminole Tribe,* the Supreme Court noted that its prior decisions had recognized only two provisions of the Constitution, § 5 of the fourteenth amendment and the interstate commerce clause, as authorizing Congress to abrogate eleventh-amendment immunity. However, the Court in *Seminole Tribe* expressly overruled *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), the decision that had established that the latter provision could be invoked to waive State sovereign immunity. 517 U.S. at 58–66, 116 S.Ct. at 1125–28. This left only § 5 as a judicially-recognized fount of authority for congressional abrogation. The Court explained:

"In *Fitzpatrick,* we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution. *Id.,* at 455, 96 S.Ct. at 2671. We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the Amendment expressly provided that

'The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.' *See id.,* at 453, 96 S.Ct. at 2670 (internal quotation marks omitted). We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment."

*Id.* at 58–60, 116 S.Ct. at 1125.

The Supreme Court has yet to address, however, whether the same logic applies to the thirteenth and fifteenth amendments, which contain enforcement provisions parallel to that of § 5 in the fourteenth amendment. *See* U.S. Const. amend. XIII, § 2; *id.* amend. XV, § 2.

**11.** In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

that the States may be liable under Title VII for disparate-impact discrimination, as well as numerous Supreme Court decisions, including *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), and *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which they characterize as interpreting § 5 to provide Congress with wide latitude in determining the nature and scope of legislation needed to secure the guarantees of the fourteenth amendment. The plaintiffs and United States contend that this mandate is sufficiently broad to permit Congress to proscribe claims that do not require proof of purposeful discrimination.

a.

An appropriate starting point for addressing the question of whether Congress acted within the bounds of its authority under § 5 when it attempted to subject the States to suit for Title VII disparate-impact claims is provided by *Scott v. City of Anniston, supra*, 597 F.2d 897 (5th Cir.1979), a decision that the plaintiffs and United States feature prominently in their briefs. In *Scott*, a class-action lawsuit brought under Title VII on behalf of black employees of the defendant city, the former Fifth Circuit reversed the trial court's holding that liability may not be established against a government agency absent a finding of intentional discrimination. Relying on *Washington v. Davis, supra*, and other decisions which hold that discriminatory intent must be shown in fourteenth-amendment actions brought against such agencies, the trial court had concluded that, "notwithstanding the power granted Congress by the fourteenth amendment, the legislature could not by statute create a right of action subject to less stringent requirements than those imposed by that amendment alone." *Scott*, 597 F.2d at 899. The former Fifth Circuit disagreed, citing the Supreme Court's decision in *Katzenbach v. Morgan, supra*, for the proposition that the fourteenth amendment "empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment." *Scott*, 597 F.2d at 899. The *Scott* court summarized the Supreme Court's analysis in *Morgan* as follows:

"The plaintiff in [*Morgan*] argued 'that an exercise of congressional power under § 5 of the Fourteenth Amendment that prohibits the enforcement of a state law can only be sustained if the judicial branch determines that the state law is prohibited by the provisions of the Amendment that Congress sought to enforce.' In rejecting this argument, the Court noted that '[i]t would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the 'majestic generalities' of § 1 of the Amendment.' The judicial task is limited to determining whether legislation enacted pursuant to the authority conferred by the fourteenth amendment is, as required by § 5, appropriate to enforce the equal protection clause."

*Id.* at 899–900 (citations to *Morgan* omitted). Consistent with this reading of *Morgan*, and in view of its conclusion that Title VII— including the disparate-impact theory of discrimination enunciated in *Griggs v. Duke Power Co.*—is unquestionably appropriate legislation to enforce the equal protection clause, the *Scott* court held that plaintiffs need not prove purposeful discrimination to establish liability under the statute, "whether the employer be private or public." *Id.* at 900. As a consequence, the *Scott* court ruled that the employees of the defendant city may prevail on their Title VII lawsuit under a disparate-impact theory without showing that they suffered from intentional discrimination.

In their briefs, the defendants do not specifically address the *Scott* decision or the question of whether it should control the outcome of the instant dispute, despite the obvious similarities between the reasoning of the lower court that was reversed in *Scott* and the argument that the defendants press here. Instead, they rely upon *Larry*, in which, as previously stated, the district court held that Congress had not validly abrogated the States' immunity in the Equal Pay Act because it had attempted to exceed the scope

of its authority under § 5.[12] The *Larry* court found that *Scott* was no impediment to its holding that, "In light of *Washington v. Davis*'s intent requirement, it makes no sense to say that Congress has the power to override the Eleventh Amendment and enforce the Equal Protection Clause against a state by applying to the state a cause of action under the Equal Pay Act which does not include the element of intent." *Larry*, 975 F.Supp. at 1449–50. Instead, the court concluded that because *Scott* merely made Title VII disparate-impact claims applicable against municipalities, Congress did not have to overcome a State's eleventh-amendment immunity and thus *Scott* did not have to address the eleventh amendment at all. *Larry*, 975 F.Supp. at 1450; *see also Larry v. Board of Trustees of the Univ. of Ala.*, 996 F.Supp. 1366, 1367 (N.D.Ala.1998) ("This court finds any discussion of the Eleventh Amendment in cases addressing the liability of a municipality to be at most dicta when confronted with the applicability of a statute to a state or state agency enjoying Eleventh Amendment immunity."). Under this reasoning, as the defendants correctly observe, *Scott* is equally inapplicable to the immediate lawsuit, because the defendants are state, and not municipal or other non-state, agencies and officials.

However, this court disagrees with the *Larry* court's analysis, and finds instead that *Scott* does indeed govern the resolution of the instant dispute. It is indisputable that, in terms of the precise factual circumstances of the case, *Scott* involved a challenge brought against a city agency rather than a state agency or state officials. It is therefore also beyond dispute that the former Fifth Circuit was not confronted in *Scott* with a challenge based upon the States' eleventh-amendment immunity. Nonetheless, this court concludes that the former Fifth Circuit's analysis in *Scott* has controlling force that extends beyond its particular facts.

Even a cursory examination of the *Scott* decision reveals that, although the eleventh amendment played no role in the outcome of that case, the court addressed a question that was in all significant respects identical to the question currently before this court. Specifically, both here and in *Scott* the central inquiry is whether Congress was authorized under § 5 of the fourteenth amendment to proscribe employment practices that do not evince a discriminatory purpose, but instead result in a racially-disproportionate impact. Thus, the focal point of the analysis in both contexts is the scope of congressional power embodied in § 5, and the critical determination confronting the court is whether Congress has exceeded that scope in subjecting a defendant to liability for certain forms of unintentional discrimination. Put somewhat differently, the inquiry under the second prong of the *Seminole Tribe* test, the issue now before this court, is essentially coextensive with the inquiry made by the *Scott* court in determining whether a discriminatory purpose must be shown in order to hold public employers liable under Title VII.[13]

The conclusion that *Scott*'s holding may be extended to State defendants is reinforced to

---

**12.** The *Larry* court recently entered a second order concerning the eleventh-amendment question, in response to a motion for reconsideration filed by the United States as intervenor, that reaffirmed the holding in its prior decision. *See Larry v. Board of Trustees of the Univ. of Ala.*, 996 F.Supp. 1366 (N.D.Ala.1998).

**13.** Commentators have remarked upon the correspondence between courts' examination of the precise scope of Congress's § 5 powers and the determination under *Seminole Tribe* of whether Congress has validly abrogated the States' sovereign immunity. *See, e.g.,* Erwin Chemerinsky, *The Religious Freedom Restoration Act is a Constitutional Expansion of Rights*, 39 Wm. & Mary L.Rev. 601, 604 n. 14 (1998) (noting that *Seminole Tribe* "increases the importance of the scope of Congress's Section 5 powers," because "the

Court held that Congress, by statute, may override the Eleventh Amendment and authorize suits against state governments only when acting pursuant to Section 5 and not when acting under its Article I powers such as the Commerce Clause [making] the scope of Section 5 critical in determining the ability to sue states in federal court to enforce federal law"); Note, *Section 5 and the Protection of Nonsuspect Classes After City of Boerne v. Flores*, 111 Harv. L.Rev. 1542, 1543 (1998) ("*Boerne*'s [a decision discussed in detail below in this order] constriction of Section 5 may have its greatest impact when read in conjunction with *Seminole Tribe v. Florida* .... [I]f Congress is going to provide litigants with a federal forum for suits against states, it must do so pursuant to Section 5, as interpreted by the *Boerne* Court.").

some degree by a careful examination of the language employed by the *Scott* court in explaining its holding. For instance, the court did not couch its holding merely in terms of cities or municipalities, but instead spoke more broadly of disparate-impact claims against "government agencies," and "public" or "governmental" employers. 597 F.2d at 898–900. Moreover, the *Scott* court gave recognition to the full breadth of its decision when it distinguished the Supreme Court's decision in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), by noting the impact of Title VII on *"state and local governments,"* and not simply on local governments. *See Scott,* 597 F.2d at 900 (emphasis added).[14]

For the foregoing reasons, the court concludes that the *Scott* decision governs the instant dispute. However, before it may find that Congress did not exceed its power under § 5 of the fourteenth amendment when it provided for disparate-impact discrimination claims against state employers, such as the defendants here, the court must determine whether *Scott*'s holding remains intact in view of more recent pronouncements by the Supreme Court regarding the scope of Congress's § 5 authority, which may call into question the analysis employed by the former Fifth Circuit. The court will devote the next section of this order to an analysis of this somewhat complicated question.

b.

As the above-quoted passages from *Scott* demonstrate, in determining the scope of congressional authority under § 5 of the fourteenth amendment, the former Fifth Circuit placed heavy reliance upon the Supreme Court's decision in *Katzenbach v. Morgan, supra.* In addition to *Morgan,* the *Scott* court also relied upon other Supreme Court decisions that, when read as a whole, established that "In addition to enacting a constitutional standard, the fourteenth and fifteenth amendments granted significant power to Congress." *Scott,* 597 F.2d at 900. This broad mandate, according to the *Scott* court's reading of the Supreme Court prece-

dents, authorized Congress "to enact more stringent standards than those provided by the fourteenth and fifteenth amendments in order to carry out the purpose of those amendments." *Id.*

*Scott* has not been overruled nor has its continued viability been called into question by the Eleventh Circuit. However, in view of the Supreme Court's recent decision in *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), in which the Court revisited *Morgan* and its expansive holding regarding the scope of § 5, it is necessary to consider whether the state of the Supreme Court's jurisprudence interpreting the scope of § 5 has substantially changed since *Scott* was decided in 1979. More to the point, the court will examine whether *Boerne* has overruled or significantly undermined the rationale of *Morgan* or the other decisions that *Scott* relied upon to such an extent that *Scott* can no longer be considered to constitute controlling precedent in this circuit. *Compare Florida League of Prof'l Lobbyists, Inc. v. Meggs,* 87 F.3d 457, 462 (11th Cir.) (a court panel was "not at liberty to disregard binding case law that is so closely on point and has only been weakened"), *cert. denied,* —— U.S. ——, 117 S.Ct. 516, 136 L.Ed.2d 405 (1996); *United States v. Smith,* 122 F.3d 1355, 1359 (11th Cir.1997) ("even where it has been weakened, but not overruled, by a Supreme Court decision, prior panel precedent must be followed"), *cert. denied,* —— U.S. ——, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997), *with Cottrell v. Caldwell,* 85 F.3d 1480, 1484–85 (11th Cir. 1996) (Because applicable prior circuit decisions "preceded [a Supreme Court decision] and cannot be reconciled with it," the Supreme Court decision must be followed.); *United States v. Shenberg,* 89 F.3d 1461, 1480 n. 23 (11th Cir.1996) (court declined to apply a prior panel decision in light of a more recent Supreme Court ruling that explicitly rejected the rationale underlying the prior decision), *cert. denied,* —— U.S. ——, 117 S.Ct. 961, 136 L.Ed.2d 847 (1997).

---

**14.** Additionally, the Eleventh Circuit has described *Scott* as holding that "Congress may apply the discriminatory effects test of Title VII to

the *states." United States v. Marengo County Comm'n,* 731 F.2d 1546, 1559 n. 20 (11th Cir. 1984) (emphasis added).

To resolve the question of whether *Boerne* has undermined the rationale relied upon by the former Fifth Circuit in *Scott*, this court must first examine the foundations of the *Morgan* decision, which as described above played a prominent role in the *Scott* court's analysis. In *Morgan*, the Supreme Court was confronted with a challenge to the constitutionality of § 4(e) of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973b(e), which invalidated an English literacy requirement imposed by a New York statute. Section 4(e) specified that the right to vote could not be denied to any person who had successfully completed the sixth grade in a public or accredited private school in Puerto Rico, in which the language of instruction was other than English, on the basis of the person's inability to read and write English. The Court concluded that § 4(e) constituted a valid exercise of Congress's authority under § 5 of the fourteenth amendment, even in the face of a prior decision, *Lassiter v. Northampton County Bd. of Elections*, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), in which the Court held that English literacy requirements for voting did not violate equal protection. *See Morgan*, 384 U.S. at 646–50, 86 S.Ct. at 1721–23.

In reaching its decision, the *Morgan* Court first rejected the New York attorney general's assertion that an exercise of congressional power under § 5 aimed at blocking enforcement of a state law is invalid absent a judicial determination that the state law runs afoul of the equal protection clause. *See Id.* at 648–49, 86 S.Ct. at 1722. It is the rejection of this argument by the *Morgan* Court, a rejection relied upon by the former Fifth Circuit in *Scott*, that allows for an expansive, even almost open-ended, interpretation of the breadth of Congress's § 5 powers: that Congress can invalidate any state law, even one that does not violate the fourteenth amendment as interpreted by the Supreme Court.[15]

The Court went on in *Morgan* to conclude that § 4(e) of the Voting Rights Act is a proper exercise of Congress's § 5 power, because it may be regarded as an enactment that enforces the equal protection clause by "secur[ing] for the Puerto Rican community residing in New York nondiscriminatory treatment by government." 384 U.S. at 652, 86 S.Ct. at 1724. The Court articulated two related rationales for its conclusion, one 'remedial' and the other 'factfinding.' Under the first rationale, the Court observed that Congress could legitimately have concluded that affording the right to vote to large segments of New York's Puerto Rican community would give them "enhanced political power" that would be "helpful in gaining nondiscriminatory treatment in public services for the entire Puerto Rican community." *Id.* at 652–53, 86 S.Ct. at 1724–25. As the Court later observed in *Boerne*, "Section 4(e) thus could be justified as a *remedial* measure to deal with 'discrimination in governmental services.'" —— U.S. at ——, 117 S.Ct. at 2168 (quoting *Morgan*, 384 U.S. at 653, 86 S.Ct. at 1725) (emphasis added). "On this view, section 4(e)'s protection of the right to vote was a remedy designed to shield Puerto Ricans from unconstitutional acts not directly connected with voting." Laurence H. Tribe, *American Constitutional Law* 341 (2d ed.1988). In other words, because the remedy was not aimed at voting, it could be viewed as not directly implicating the Supreme Court's decision in *Lassiter*, which held that English literacy requirements for voting did not violate equal protection.

The second rationale provided in *Morgan* for upholding § 4(e) was that this provision "was merely legislation aimed at the elimination of an invidious discrimination in establishing voter qualifications." *Morgan*, 384 U.S. at 654, 86 S.Ct. at 1725. Under this rationale, the Court explained that Congress may have, by exercise of its legislative factfinding function, found that prejudice actual-

15. In *Morgan*, the Court noted that Congress has the power only to expand, not "dilute[,] equal protection and due process decisions of [the] Court." 384 U.S. at 651 n. 10, 86 S.Ct. at 1724 n. 10. This concept has come to be labeled the "ratchet," or substantive, theory, which allows Congress to increase, but not dilute, the protection provided by the fourteenth amendment. *See* Note, *Section 5 and the Protection of Nonsuspect Classes After City of Boerne v. Flores*, 111 Harv. L.Rev. 1542 (1998).

ly motivated the State legislature to enact the English literacy requirement. *See id.* Moreover, the Court noted that Congress may have weighed numerous competing considerations, including whether denial of the franchise was a necessary or appropriate means of encouraging people to learn English, whether such a denial was a proper way to further the goal of an intelligent exercise of the voting right, or whether the ability to read or understand Spanish further the intelligent-exercise goals for those who have access to Spanish-language media that address election issues. *See id.* at 654–56, 86 S.Ct. at 1726–26. As the Court emphasized, such activity by Congress supports a finding that the legislation constitutes a valid exercise of its § 5 authority, so long as the Court "perceive[s] a basis upon which Congress might predicate a judgment that the application of New York's English literacy requirement to deny the right to vote to a person with a sixth grade education in Puerto Rican schools in which the language of instruction was other than English constituted an invidious discrimination in violation of the Equal Protection Clause." *Morgan*, 384 U.S. at 665, 86 S.Ct. at 1726. But more importantly, this second rationale is also consistent with an expansive interpretation of Congress's authority under § 5, as described above, when one recalls that that Court had previously held in *Lassiter* that English literacy tests do not violate the equal protection clause. In other words, the second rationale could also be viewed as reflecting the principle that Congress may go beyond the judicially-defined substantive bounds of the equal protection clause in protecting individuals against discrimination.

It is the expansive interpretation of the second rationale in *Morgan* that the former Fifth Circuit relied upon in *Scott* to discredit the trial court's assumption that, in view of the holdings in *Washington v. Davis* and other Supreme Court decisions that discriminatory intent must be shown in fourteenth-amendment actions against government agencies, § 5 authorized Congress to proscribe only purposeful discrimination and not discrimination based upon a finding of a racially-disproportionate impact. As discussed above, the *Scott* court, citing *Morgan* and other decisions, held instead that § 5 authorizes Congress to enact more stringent standards than those provided by the fourteenth amendment in order to carry out the purpose of that amendment. *See Scott*, 597 F.2d at 900.

Thus, the question that must be asked of *Boerne* is whether that decision overruled, explicitly or implicitly, this expansive interpretation of the *Morgan* Court's second rationale, as well as the other portion of the decision discussed above, in which the Court rejected the New York attorney general's assertion that Congress cannot use its § 5 powers to block enforcement of a State law unless there is a judicial determination that the enactment violates the equal protection clause. The court will now turn to this question.

In *Boerne*, the Supreme Court exploited the opportunity presented by the plaintiffs' constitutional challenge to the Religious Freedom Restoration Act of 1993, 42 U.S.C.A. §§ 2000bb through 2000bb–4 (RFRA), to revisit and further elucidate the scope of its decision in *Morgan*. The defenders of RFRA in *Boerne* argued that, although the statute prohibited conduct that was not unconstitutional, it still constituted permissible enforcement legislation under § 5 because Congress was "only protecting by legislation one of the liberties guaranteed by the Fourteenth Amendment's Due Process Clause, the free exercise of religion, beyond what is necessary under *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), in which the Court held that neutral laws of general applicability may not be challenged under the free exercise clause." *Boerne*, — U.S. at —, 117 S.Ct. at 2162–63. The defenders of RFRA also contended that "the congressional decision to dispense with proof of deliberate or overt discrimination and instead concentrate on a law's effects accords with the settled understanding that § 5 includes the power to enact legislation designed to prevent as well as remedy constitutional violations." *Id.* at —, 117 S.Ct. at 2163.

Thus, one of the central issues addressed in *Boerne* was whether Congress exceeded its authority under § 5 when it enacted RFRA, including its provisions that may be applied to invalidate State laws absent proof of intentional discrimination. In examining this issue, the Court first cited *Morgan* and other decisions to reaffirm *Morgan*'s second rationale: that "Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *Boerne*, —— U.S. at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick*, 427 U.S. at 455, 96 S.Ct. at 2671). However, having apparently resubscribed to this expansive view of Congress's § 5 authority, the *Boerne* Court was quick to point out that Congress's power is far from unlimited, and the Court devoted a significant amount of ink to an explanation of why the enforcement power is limited to remedial and preventative measures, and does not encompass what the Court deemed to be a "substantive, non-remedial power." *Id.* at ——, 117 S.Ct. at 2167.

It is in this context that the *Boerne* Court turned its attention to *Morgan*. Specifically, the Court warned against a too-expansive reading of *Morgan* as follows: "There is language in our opinion in *Katzenbach v. Morgan* ... which could be interpreted as acknowledging a power in Congress to enact legislation that expands the rights contained in § 1 of the Fourteenth Amendment. This is not a necessary interpretation, however, or even the best one." *Id.* at ——, 117 S.Ct. at 2168.[16] The Court then discussed the two rationales in *Morgan* that this court described above. For present purposes, the *Boerne* Court's discussion of the second rationale is most significant, because, as explained above, it was that rationale that the *Scott* court relied upon in ruling that § 5 empowers Congress to proscribe disparate-impact discrimination. The *Boerne* Court characterized the second rationale as "an alternative holding," and noted that it was grounded on the Court's having "perceived a factual basis on which Congress could have concluded that New York's literacy requirement 'constituted an invidious discrimination in violation of the Equal Protection Clause.'" *Boerne*, —— U.S. at ——, 117 S.Ct. at 2168 (quoting *Morgan*, 384 U.S. at 656, 86 S.Ct. at 1726). The Court did not portray this second rationale as being based upon its recognition of Congress's authority under § 5 to go beyond the judicially-defined substantive bounds of the equal protection clause and enact more stringent standards than those provided by the fourteenth amendment in order to carry out the purpose of that amendment. Instead, the Court cited Justice Stewart's statement in *Oregon v. Mitchell*, 400 U.S. 112, 296, 91 S.Ct. 260, 350, 27 L.Ed.2d 272 (1970) (Stewart, J., concurring in part and dissenting in part), that "interpreting *Morgan* to give Congress the power to interpret the Constitution 'would require an enormous extension of that decision's rationale.'" *Boerne*, —— U.S. at ——, 117 S.Ct. at 2168.

The Court explained: "Congress' power under § 5 ... extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment. The Court has described this power as 'remedial.' The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States." *Id.* at ——, 117 S.Ct. at 2164 (citation omitted). And with this limitation of Congress's power to 'remedial' only, the Court then redefined the test for whether Congress has exceeded its § 5 enforcement power as whether there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* "Lacking such a connection, legislation may become substantive in operation and effect." *Id.*

Thus, on the one hand, Congress's § 5 enforcement power includes "Legislation which ... prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously re-

---

**16.** With this statement, the *Boerne* Court rejected the approach derived from *Morgan* that has been labeled the "ratchet," or substantive, theory. *See supra* note 15.

served to the States,'" *id.* at ——, 117 S.Ct. at 2163 (quoting *Fitzpatrick,* 427 U.S. at 455, 96 S.Ct. at 2671). However, the legislation must still be remedial in nature, that is, there must be "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at ——, 117 S.Ct. at 2164.

Having recognized a broad but still cabined view of Congress's § 5 power, the *Boerne* Court went on to consider whether the act at issue, RFRA, could be considered legitimate 'enforcement' legislation under § 5. The court, after analyzing RFRA under this standard, concluded: "Regardless of the state of the legislative record, RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning. RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections." *Id.* at ——, 117 S.Ct. at 2170.

Unfortunately, assessing the precise impact that the pronouncements in *Boerne* discussed above have on *Morgan*'s interpretation of Congress's authority under § 5, and, by extension, on the former Fifth Circuit's analysis in *Scott,* is not a straightforward exercise; there is an obvious imprecision, and even an inner tension, if not logical conflict, in the notion that Congress can prohibit conduct which is not itself unconstitutional, but yet cannot make a substantive change in the law. Indeed, the Supreme Court recognized as much when it stated that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern." *Id.* at ——, 117 S.Ct. at 2164.

This observation is also borne out by a very recent decision from the Eleventh Circuit, *Kimel v. State of Florida Bd. of Regents,* 139 F.3d 1426 (11th Cir.1998), in which two panel members adopted contradictory conclusions regarding how *Boerne* affects the

determination of whether a legislative enactment reflects a valid exercise of Congress's § 5 power. *Kimel* addressed two related legal questions, namely whether Congress validly abrogated the States' eleventh-amendment immunity for lawsuits brought pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621 through 634, and pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 through 12213. These questions yielded three separate opinions. In the principal opinion, Judge Edmondson concluded that because the ADEA did not contain a clear and unequivocal expression of Congress's intent to abrogate, the statute failed the first prong of the *Seminole Tribe* test, and, therefore, that Congress had not properly abrogated the States' sovereign immunity in the ADEA. *Kimel,* 139 F.3d at 1430–33. Judge Edmondson further concluded, by contrast, that the ADA satisfied both prongs of the *Seminole Tribe* test, because the enactment contained an unequivocal statement of intent to abrogate, and because it had been enacted pursuant to Congress's § 5 authority. *See id.* at 1432–33. Chief Judge Hatchett wrote the second opinion in the case, in which he concurred in Judge Edmondson's holding regarding the ADA, but dissented from his conclusion that Congress had failed properly to abrogate as to claims brought under the ADEA. *See id.* at 1433–44 (Hatchett, C.J., concurring in part and dissenting in part). In the third opinion, Judge Cox expressed his view that Congress lacked authority under § 5 to abrogate the States' sovereign immunity under either statute, and he therefore concurred in the principal opinion's conclusion regarding the ADEA, but dissented as to its holding regarding the ADA. *See id.* at 1444–49 (Cox, J., concurring in part and dissenting in part).

Of greatest significance to the instant dispute are the contradictory conclusions reached by Chief Judge Hatchett and Judge Cox regarding *Boerne* and its consequences.[17] Judge Cox interpreted *Boerne* as dismissing any language in *Morgan* that ar-

---

17. In the principal opinion, Judge Edmondson did not consider whether *Boerne* affected his conclusion that the ADA was properly enacted

under Congress's § 5 enforcement powers. *See Kimel,* 139 F.3d 1426, 1430.

guably recognizes "a congressional power not only to effectuate Supreme Court-identified rights but also to find Fourteenth Amendment rights not yet identified by the Supreme Court." *Kimel*, 139 F.3d 1426, 1446. He first acknowledged, however, the imprecision in the standard established by *Boerne*, noting that "Enforcement can include creating some rights beyond those clearly guaranteed by the Constitution, ... [b]ut ... such extensions of rights must be proportional to an unconstitutional injury that Congress is seeking to remedy." *Id.* He then went on to describe his understanding of Congress's § 5 powers in the wake of *Boerne* as follows:

> "Only by respecting Supreme Court interpretations of the Fourteenth Amendment can Congress avoid impermissibly interpreting the Amendment itself. Congress nonetheless may, if circumstances warrant, tweak procedures, find certain facts to be presumptively true, and deem certain conduct presumptively unconstitutional in light of Supreme Court interpretation. Thus, legislation enacted pursuant to § 5 must hew to the contours of Supreme Court-defined Fourteenth Amendment rights unless the legislation is a proportional response to a documented pattern of constitutional violation."

*Id.* at 1445–47 (internal citations omitted). Thus, Judge Cox appears to have concluded that an interpretation of *Morgan* that gives Congress open-ended, substantive authority is now foreclosed by *Boerne*, and that Congress may not proscribe conduct not deemed unconstitutional under the fourteenth amendment except where there is "a documented pattern of constitutional violation." *Id.*

Chief Judge Hatchett concluded that *Boerne* does not upset the principle that "Congress does not merely 'rubber stamp' the constitutional violations that the Supreme Court has already found to exist ... nor does it have to legislate to remedy only that conduct that the Court would find unconstitutional, even though the Court has not yet so ruled." *Id.* at 1438. Quoting the same passage from *Morgan* that was cited in *Scott*, in which the *Morgan* Court had rejected the State's argument that a congressional enactment could not be sustained as a proper

exercise of § 5 authority absent a judicial determination that the equal protection clause forbade the action proscribed by the enactment, Chief Judge Hatchett emphasized that he "decline[d] to read such a limitation of Congress's power into the *Boerne* decision." *Id.* at 1439. Moreover, Chief Judge Hatchett also cited *Scott* itself in support of his position, quoting its holding that "The fourteenth amendment empowers Congress to enact appropriate legislation establishing more exacting requirements than those minimum safeguards provided in the amendment[,]" as long as Congress does so "to carry out the purpose of [the] amendment[ ]." *Id.* at 1438 (quoting *Scott*, 597 F.2d at 900).

However, when all the broad legal pronouncements are put aside, it appears that, at bottom, Chief Judge Hatchett and Judge Cox differ on whether the ADEA and ADA each reflected " 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.' " *Kimel*, 139 F.3d at 1439 (quoting *Boerne*, —— U.S. at ——, 117 S.Ct. at 2164). This is because the question of whether there is congruence and proportionality is too much in the eye of the beholder. Moreover, the congruence-and-proportionality standard, without further significant direction or refinement, simply does not resolve the inner tension in the notion that Congress can prohibit conduct which is not itself unconstitutional, but yet cannot make a substantive change in the law.

Fortunately, it is possible to discern some additional guidance from the *manner* in which the *Boerne* Court applied the congruence-and-proportionality standard to RFRA. First of all, the *Boerne* Court looked to the statute itself and observed, as stated, that it is "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." —— U.S. at ——, 117 S.Ct. at 2170. The Court stated that, "Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional," *id.*, but this was simply not

true with regard to the RFRA, which, as the Court described the act, "prohibits '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.' [42 U.S.C.A. § ] 2000bb–1." *Id.* at ——, 117 S.Ct. at 2162. Indeed, in RFRA's opening "findings and declarations of purposes," Congress nakedly admits that the central purpose of the act was that "governments should not substantially burden religious exercise without compelling justification," 42 U.S.C.A. § 2000bb(a)(3); the statute does not state that *intentional religious discrimination* was a national problem and that Congress was out to address it.

In addition, the Court noted that, although Congress is not obligated to create a legislative record, *see Boerne,* —— U.S. at ——, 117 S.Ct. at 2170 ("As a general matter, it is for Congress to determine the method by which it will reach a decision."), a legislative record, if it exists, can be "instructive." *Id.* at ——, 117 S.Ct. at 2169. However, the really significant import of the *Boerne* Court's action in this regard lies not in the fact that the *Boerne* Court looked to RFRA's legislative record, but rather in the *manner* in which the Court treated that record, and, more significantly, in *what* the Court sought to find in the record. There was no question that RFRA had a generous legislative record, and that this legislative record could be viewed as firmly supporting the need for legislation, such as RFRA, that prohibits governments from substantially burdening a person's exercise of religion even if the burden results from a rule of general applicability. *Id.* at ——, 117 S.Ct. at 2162. The problem is that, for constitutional purposes, the primary focus of the legislative record was on the wrong issue. The free-exercise-clause issue that Congress was limited to addressing under § 5 was whether there were "modern instances of generally applicable laws passed *because of* religious bigotry," *id.* at ——, 117 S.Ct. at 2169 (emphasis added), namely, whether there were "modern

day instances of generally applicable laws" which had been *intentionally* passed to discriminate because of religion. Without this substantial hook or tie to an effort—and a primary effort at that—to redress unconstitutional conduct, RFRA could not be viewed as passed to address a violation of a judicially recognized fourteenth-amendment right—in this case the free-exercise-clause right to be free from intentional religious discrimination—but rather a right outside the amendment.

The teaching of *Boerne* is that there must be a substantial constitutional hook: The principal object of the legislation must be to address rights that are judicially recognized; Congress can prohibit conduct that is not unconstitutional, but such legislation must be nothing more than incidental to a primary effort of prohibiting conduct that is unconstitutional. To put it more metaphorically, with regard to the challenged congressional legislation, the prohibited constitutional conduct must be, at most, always a bridesmaid and never the bride; the bride must always be the unconstitutional conduct.

Secondly, the *Boerne* Court addressed how closely hewed RFRA was to addressing the "evil presented." *Id.* at ——, 117 S.Ct. at 2169. "Strong measures appropriate to address one harm may be an unwarranted response to address another, lesser one." *Id.* The Court found that RFRA was so "out of proportion" to the "unconstitutional behavior," that it constituted "a substantive change in constitutional protections." *Id.* at ——, 117 S.Ct. at 2170. Thus, Congress can prohibit conduct which is not itself unconstitutional, but such legislation must not only be incidental to the primary effort of prohibiting conduct that is constitutional, it must also constitute a proportionate response to the evil presented.

 In conclusion, this court discerns from *Boerne* the following helpful guidelines: (1) Of course, Congress, in the exercise of its § 5 enforcement power, may pass laws that prohibit conduct that is judicially recognized as unconstitutional under the fourteenth amendment. (2) Congress may also pass laws that prohibit conduct which is not itself

unconstitutional under the fourteenth amendment, so long as the laws are remedial; that is, there is a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Two of the factors that should inform the court in assessing whether there is congruence and proportionality are (a) whether the legislation that prohibits conduct that is not itself unconstitutional is incidental to a primary effort of prohibiting conduct that is unconstitutional; and (b) whether, assuming (a) is satisfied, Congress has adopted measures that correspond to the magnitude of the evil presented.

Here, obviously, the court is confronted with the question of whether Congress can prohibit conduct which is not itself unconstitutional: that is, disparate-impact discrimination. What was missing in *Boerne* is, however, present here. To understand why the court reaches this conclusion, one need only turn to the language and structure of Title VII. The centerpiece of the act is 42 U.S.C.A. § 2000e–2(a), which makes it "an unlawful employment practice for an employer" to "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race [or] color, ...; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, *because of* such individual's race [or] color ...." (Emphasis added.) The central aim of the act is intentional discrimination, which is, of course, prohibited by the fourteenth amendment. Thus, the substantial constitutional hook is present here.

This conclusion is reinforced by the legislative history of Title VII and subsequent Supreme Court decisions interpreting this history. One would have to close one's eyes to a century of this country's history to not know that, before the enactment of Title VII in 1964—and even for a long time thereafter, until the statute's prohibitions were put into effect, or otherwise came to be honored, on a large scale—intentional discrimination against African–Americans was the way of life throughout much of this land and, indeed, was the rule of law at state and local levels in the South. *See, e.g.,* C. Van Woodward, *The Strange Career of Jim Crow* (3d rev. ed.1974): *see also, e.g., Dillard v. Crenshaw County,* 640 F.Supp. 1347, 1357 (M.D.Ala. 1986) (describing in detail the State of Alabama's "unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave."). And a 1963 House Report that led to passage of Title VII and other titles in the 1964 Civil Rights Act reflected as much: "In various regions of the country there is discrimination against some minority groups. Most glaring, however, is the discrimination against Negroes which exists throughout our Nation. Today, more than 100 years after their formal emancipation, Negroes, who make up over 10 percent of our population, are by virtue of one or another type of discrimination not accorded the rights, privileges, and opportunities which are considered to be, and must be, the birthright of all citizens." H. Rep. No. 88–914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2393. This legislative history indicates that Title VII was part of a massive package of national anti-discriminatory laws intended to "cure this evil" of racial discrimination. *Id.* at 2515. Title VII, therefore, falls squarely and solidly within the § 5 powers of Congress· under the fourteenth amendment.

Even prior to the enactment of Title VII, Congress had recognized that there exists an intimate relationship between the invidious racial discrimination just discussed and discrimination that results from conduct having a racially-disproportionate impact. As explained above, the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) interpreted Title VII to proscribe disparate-impact discrimination as well as purposeful racial discrimination. Furthermore, after enactment of the 1972 amendments to Title VII, which, as stated, applied the statute's strictures against the States, the Supreme Court in *Connecticut v. Teal,* 457 U.S. 440, 447 n. 8, 102 S.Ct. 2525, 2530 n. 8, 73 L.Ed.2d 130

(1982), examined the legislative history of the amendments and concluded that Congress had "recognized and endorsed" *Griggs*'s disparate-impact theory of discrimination. In surveying the legislative history of the 1972 amendments, the *Teal* Court made the following pertinent observations regarding the legislative findings that led Congress to extend protection against disparate-impact discrimination to governmental employees. First, the Court quoted a passage from a 1971 Senate Report on the proposed amendments that described the current understanding of employment discrimination as follows: "Employment discrimination as viewed today is a ... complex and pervasive phenomenon. Experts familiar with the subject now generally describe the problem in terms of 'systems' and 'effects' rather than simply intentional wrongs." S.Rep. No. 92–415, at 5 (1971) *quoted in Teal*, 457 U.S. at 447 n. 8, 102 S.Ct. at 2531 n. 8; *see also* H. Rep. No. 92–238, at 8 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2144. A 1971 House Report went on to note that: "The literature on the subject is replete with discussions of the mechanics of seniority and lines of progression, perpetuation of the *present effects of earlier discriminatory practices* through various institutional devices, and testing and validation requirements." H. Rep. No. 92–238, at 8 (1971), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2144 (internal footnote omitted) (emphasis added).

The *Teal* Court therefore recognized that the devastating vestiges of this country's longstanding and deep-rooted history of intentional racial discrimination would not, and could not, wither away of their own accord any time soon. The Court explained that the *Griggs* Court had recognized the close nexus between evidence of disparate racial impact and the invidious discrimination proscribed by the fourteenth amendment, as follows: "'*Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives.'" *Teal*, 457 U.S. at 447, 102 S.Ct. at 2531 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 806, 93 S.Ct. 1817, 1826,

36 L.Ed.2d 668 (1973)). Thus, Title VII's legislative history reflects that the premise of the act was societally widespread and long-standing intentional discrimination against African–Americans, the deep-rooted effects of which could not be adequately addressed merely by a ban on intentional discrimination. Thus, Title VII's disparate-impact theory was an incidental but still quite necessary remedial measure tied to Congress's noble effort to address this country's "sorry history of race relations," *Adarand Constructors v. Pena*, 515 U.S. 200, 255, 115 S.Ct. 2097, 2126, 132 L.Ed.2d 158 (1995), a primary effort which, as previously explained, clearly falls within Congress's § 5 powers.

As stated, the *Teal* Court did not stop here, however. The Court further observed that Congress had, in enacting the 1972 amendments, "voiced its concern about the widespread use *by state and local governmental agencies* of 'invalid selection techniques' that had a discriminatory impact." *Teal*, 457 U.S. at 449, 102 S.Ct. at 2532 (quoting S.Rep. No. 92–415, at 10 (1971)) (emphasis added). The Court noted that Congress had relied upon a report prepared by the United States Commission on Civil Rights, which summarized the Commission's findings of pervasive discrimination in state and local government employment and concluded that "serious [barriers] to equal opportunity' existed for state and local governmental employees." *Id.* at 449 n. 10, 102 S.Ct. at 2532 n. 10 (quoting U.S. Commission on Civil Rights, For All the People ... By All the People—A Report on Equal Opportunity in State and Local Government Employment 119 (1969), *reprinted in* 118 Cong. Rec. 1817). Among the cited barriers were two that do not necessarily evince intentional discrimination, but may have a disproportionate impact: "'recruitment and selection devices which are arbitrary, unrelated to job performance, and result in unequal treatment of minorities,'" and "promotions made on the basis of 'criteria unrelated to job performance and on discriminatory supervisory ratings.'" *Id.*

Finally, as *Boerne* requires, disparate-impact liability is a proportionate response to the evil presented. As previously stated; in

the 1972 amendments, Congress responded to a documented pattern of constitutional violations by including disparate-impact claims of discrimination within the ambit of Title VII, as applied against both private and governmental employers. That this legislative reaction is the type of proportional and congruent response demanded by the Supreme Court becomes manifestly clear when one recalls that the theory of disparate-impact liability, as a means of counteracting practices that are fair in form, but discriminatory in operation, was first articulated *by the Supreme Court itself,* in *Griggs.* The Court has not subsequently questioned the propriety of the disparate-impact theory as a congressional response to the discriminatory practices it sought to eliminate by means of Title VII, but instead has continued to apply and refine the theory in the years after *Griggs. See, e.g., Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In any event, the treatment of disparate-impact claims of discrimination, as it has evolved in the Supreme Court's Title VII jurisprudence, bears a strong resemblance to, and closely parallels, the treatment of claims of intentional discrimination under the statute. Specifically, disparate-impact claims are assessed by employing a three-step process similar to the one used in assessing a disparate-treatment claim. First, the employee must identify the specific employment practice challenged and, further, must show that the challenged practice falls significantly more harshly on one group than another, that is, that the practice under attack has created "adverse impact." *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124. If this showing is made, the burden then shifts "to the employer to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." [18] 42 U.S.C.A. § 2000e–2(k)(1)(A). Finally, even if the employer satisfies its burden, the employee may prevail if she shows that the employer's justification for the practice has no basis in fact or that another practice, without a similarly undesirable adverse effect, would also serve the employer's legitimate employment interests. *Wards Cove,* 490 U.S. at 660–61, 109 S.Ct. at 2126–27. As the Court explained in *Wards Cove,* the employer's refusal to adopt race-neutral alternatives where available "would belie a claim ... that their incumbent practices are being employed for nondiscriminatory reasons." 490 U.S. at 660–61, 109 S.Ct. at 2127.

It is evident that the foregoing approach to disparate-impact claims is based upon the Supreme Court's perception that a close relationship exists between such claims and those alleging intentional discrimination. In fact, the Court's approach, especially with regard to its treatment of employers who refuse to adopt race-neutral alternative practices, evidences a recognition that a challenged practice's racially-disproportionate impact may be a strong indication that the practice, though facially neutral, actually stemmed from discriminatory animus. Thus, there is no doubt that the disparate-impact and disparate-treatment theories of discrimination, as they have evolved in the years since *Griggs,* are parallel theories that in many instances rely upon identical or nearly-identical evidence and, therefore, are often to some extent intertwined.

In view of this close relationship between the two theories of discrimination, it is difficult to imagine that the Supreme Court, even if it had intended in *Boerne* to retreat—even more than this court has allowed—from its relatively expansive interpretation of Congress's § 5 powers, sought to circumscribe these powers so dramatically that they no longer permit Congress to proscribe dispa-

---

**18.** In *Wards Cove,* the Court held that the employer's burden was one of production only. *See* 490 U.S. at 660, 109 S.Ct. at 2126. However, in the 1991 amendments to Title VII, Congress placed the burden of persuasion regarding business justification back on the employer, re-

turning to the original standard as articulated in *Griggs. See Bradley v. Pizzaco of Nebraska, Inc.,* 7 F.3d 795, 797 (8th Cir.1993); *Sims v. Montgomery County Comm'n,* 890 F.Supp. 1520, 1530 & n. 18 (M.D.Ala.1995).

rate-impact discrimination as well as disparate-treatment discrimination. Such a judicial constriction of Congress's authority to enact appropriate legislation under the fourteenth amendment would, as the Court recognized in *Morgan,* impermissibly relegate Congress's role to "merely informing the judgment of the judiciary by particularizing the 'majestic generalities' of § 1 of the Amendment." 384 U.S. at 648–49, 86 S.Ct. at 1722. In other words, if Congress, after *Boerne,* cannot wield its § 5 authority to prohibit a form of discrimination as closely associated with intentional discrimination as is disparate-impact discrimination, then the Supreme Court will have effectively drained § 5 of any real meaning, and left Congress powerless to enforce the equal protection clause beyond carrying out the "insignificant role" of providing plaintiffs with a federal judicial forum for redressing wrongs caused by conduct that the courts are prepared to adjudge unconstitutional. *Morgan,* 384 U.S. at 648–49, 86 S.Ct. at 1722.

Indeed, Congress's imposition of disparate-impact liability on the States is in full sync with other measures it has imposed on the States, pursuant to its § 5 enforcement power, that did not rest on an underlying judicial finding of intentional discrimination. *See, e.g., Katzenbach v. Morgan, supra* (upholding ban on literacy tests that prohibited certain people schooled in Puerto Rico from voting); *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (upholding 5–year nationwide ban on literacy tests and similar voting requirements for registering to vote); *City of Rome v. United States,* 446 U.S. 156, 161, 100 S.Ct. 1548, 1553, 64 L.Ed.2d 119 (1980) (upholding 7–year extension of the Voting Rights Act's requirement that certain jurisdictions preclear any change to a " 'standard, practice, or procedure with respect to voting' ").

Based upon the foregoing analyses, this court concludes that, even if *Boerne* did undermine the holding in *Scott* by substantially constricting the expansive scope, as described in *Morgan,* of Congress's powers under § 5, Congress nonetheless acted well within its post-*Boerne* § 5 powers when it imposed disparate-impact liability against employers in Title VII. Thus, the court would find that second prong of *Seminole Tribe* has been satisfied even if *Scott* were deemed no longer to constitute binding precedent in this circuit.

Indeed, the court must candidly admit that, if the theory of disparate-impact liability, as it has evolved in the Supreme Court's Title VII jurisprudence, does not meet the *Boerne* test of when Congress can prohibit conduct that is not itself unconstitutional, then the test cannot be met in any meaningful way at all. It is a trick test.

## III. CONCLUSION

Accordingly, the court rejects the defendants' eleventh-amendment challenge to the plaintiffs' disparate-impact claims of discrimination, because, as determined by application of the two-prong test articulated in *Seminole Tribe,* Congress validly abrogated the States' sovereign immunity as to such claims brought pursuant to Title VII.

For the foregoing reasons, it ORDERED that the defendants' motion to dismiss disparate impact claims, filed on August 27, 1997 (Doc. no. 2063), in *Reynolds v. Alabama Dep't of Transp.,* civil action no. 85–T–665–N, is denied.