IN RE: EMPLOYMENT DISCRIMINATION LITIGATION AGAINST THE STATE OF ALABAMA, et al.,

Eugene Crum, Jr., individually and on behalf of a class of similarly situated individuals, Robert L. Smith, et al., Plaintiffs-Appellees,

v.

State of Alabama, Halycon Vance Ballard, individually and in her official capacity as Director, Alabama Department of Personnel, et al., Defendants-Appellants,

United States of America, Intervenor.

No. 98-6600.

United States Court of Appeals,

Eleventh Circuit.

Dec. 29, 1999.

Appeal from the United States District Court for the Middle District of Alabama. (No. 94-00356-CV-T-N), Myron H. Thompson, Judge.

Before ANDERSON, Chief Judge, TJOFLAT, Circuit Judge, and FAY, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

The question presented in this appeal is whether Congress validly abrogated the states' Eleventh Amendment sovereign immunity from claims arising under the disparate impact provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* We answer in the affirmative.

I.

On March 24, 1994, the United States District Court for the Middle District of Alabama consolidated several race discrimination cases[1] brought by African-Americans against the State of Alabama, and several of its boards, departments, and agencies;[2] they also sued the Governor of Alabama and other state officials

---

[1]Federal Rule of Civil Procedure 42(a) provides that, "[w]hen actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay."

[2]The named defendants in this case include the following boards, departments, and agencies of the State of Alabama: the Personnel Board, the Department of Corrections, the Alcoholic Beverage Control

in both their individual and official capacities.[3] Some of the cases were class actions in which plaintiffs sued on behalf of themselves and all other black persons who are employed, have been employed, or who may in the future be employed by the defendants.[4] Plaintiffs claimed, *inter alia,* discrimination against African-Americans

> in layoffs, recalls from layoffs, terminations, discipline, hiring, rehiring, evaluations, compensation, transfers, job duty assignments, recruitment, screening, selection procedures, denial of promotions, demotions, rollbacks, sick leave, subjective decision-making practices, and other terms and conditions of employment which have resulted in disparate impact and treatment of the plaintiff-intervenors and the plaintiff class.

They sought declaratory, injunctive, and compensatory relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000(e), *et seq.,* and 42 U.S.C. §§ 1981 and 1983 (1994).

On October 7, 1997, the State of Alabama and all parties named as defendants moved the court, under Federal Rule of Civil Procedure 12(b)(1),[5] to dismiss any and all claims arising under Title VII that were

> predicated upon a disparate impact theory of discrimination[,] on the separate grounds that (a) the assertion of such claims against the State is barred by the doctrine of sovereign immunity embodied in the Eleventh Amendment to the United States Constitution and (b) Congress did not express an unequivocal intent to waive immunity from such claims.

---

Board, the Emergency Management Agency, the Department of Economics and Community Affairs, the Industrial Development Training Agency, the Bureau of Tourism and Travel, the Department of Agriculture and Industries, the Department of Education, the Department of Revenue, the Department of Public Health, the Development Office, the Retirement System of Alabama, Voters Registration, the Department of Human Resources, the Department of Mental Health, the Medicaid Agency, the Board of Public Accounting, the Commission on Physical Fitness, the Labor Board, the State Docks Department, and the Department of Transportation.

[3] In this case, we are concerned only with the disparate impact provisions of Title VII. We are aware that Title VII "provides relief only against 'employers' as defined under the statute." *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1243 (11th Cir.1998), *cert. denied,* --- U.S. ----, 120 S.Ct. 327, --- L.Ed.2d ---- (1999). We note the individual defendants only as background.

[4] The issue of class certification is currently pending before the district court.

[5] Rule 12(b)(1) provides that the defendant may assert the defense that the court lacks jurisdiction over the subject matter of the case.

The district court denied defendants' motion without prejudice, citing its recent decision in *Reynolds v. Alabama Department of Transportation,* 4 F.Supp.2d 1092 (M.D.Ala.1998).[6] Defendants moved the court to issue a final, appealable order under Federal Rule 54(b), and the court granted defendants' motion, vacating its earlier order, and denying defendants' motion for dismissal on the merits. Again citing its decision in *Reynolds,* the district court held that the Eleventh Amendment did not bar private suits against states under Title VII, which are predicated on a disparate impact theory of liability. Defendants timely appealed.[7]

## II.

A district court's order denying or granting a motion to dismiss a complaint against a state based on the Eleventh Amendment's grant of sovereign immunity is reviewed by this court *de novo. See Seminole Tribe v. Florida,* 11 F.3d 1016, 1021 (11th Cir.1994), *aff'd on other grounds,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

## III.

In resolving the issues presented on this appeal, it is helpful to look first at the anatomy of a Title VII discrimination case that employs disparate impact methodology.[8] The genesis of the disparate impact theory

---

[6]The court denied the motion without prejudice because the identical issue was raised in *Reynolds,* and the court assumed that the state defendants in *Reynolds* would appeal the court's decision that the Eleventh Amendment was not a bar to private suits under Title VII predicated on a disparate impact theory of liability. The defendants in *Reynolds* did appeal to this court, and a resolution of their appeal has been stayed pending the disposition of this appeal.

[7]Although states can waive their sovereign immunity, the Eleventh Amendment has been interpreted as a jurisdictional barrier to the power of the federal courts. *See Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890) ("The truth is that the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the constitution when establishing the judicial power of the United States."). As such, the Supreme Court has held that a district court order denying a claim by a state or a state entity to Eleventh Amendment immunity from suit in federal court may be appealed under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

[8]We use the term "disparate impact" to distinguish from cases brought under the "disparate treatment" rationale. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (discussing burdens of proof in a disparate treatment case). Also, whenever the Attorney General "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice" of discrimination, he or she may bring an appropriate lawsuit. 42 U.S.C. § 2000e-6(a) (1994); *see, e.g.,*

lies in the Supreme Court's decision in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d

158 (1971).  The question presented in *Griggs* was

> whether an employer is prohibited by the Civil Rights Act of 1964, Title VII, from requiring a high
> school education or passing of a standardized general intelligence test as a condition of employment
> in or transfer to jobs when (a) neither standard is shown to be significantly related to successful job
> performance, (b) both requirements operate to disqualify Negroes at a substantially higher rate than
> white applicants, and (c) the jobs in question formerly had been filled only by white employees as
> part of a longstanding practice of giving preference to whites.

*Id.* at 425-26, 91 S.Ct. at 851.[9]  Prior to the date of Title VII's enactment, the defendant company in *Griggs*

had openly discriminated on the basis of race in the hiring and assignment of its employees.  When the

company abandoned its policy of *de jure* discrimination, it made the completion of high school a prerequisite

for employees who wanted to transfer from the company's labor department (the only department previously

employing African-Americans) to any other department in the company (all of which formerly hired only

whites).  The Court found that the high school requirement, as well as other standardized tests used by the

_____

*Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977);
*International Bhd. of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).  In
both disparate treatment and pattern or practice cases, the plaintiffs are ultimately required to demonstrate
discriminatory intent on the part of the employer.

   [9]The particular provisions of Title VII interpreted by the Supreme Court in *Griggs* were 42 U.S.C. §
2000e-2(a)(2) and (h):

> (a) It shall be an unlawful employment practice for an employer—
>
> ....
>
>    (2) to limit, segregate, or classify his employees in any way which would deprive
> or tend to deprive any individual of employment opportunities or otherwise adversely
> affect his status as an employee, because of such individual's race, color, religion, sex, or
> national origin.
>
> ....
>
> (h) Notwithstanding any other provision of this title, it shall not be an unlawful
> employment practice for an employer ... to give and to act upon the results of any
> professionally developed ability test provided that such test, its administration or action
> upon the results is not designed, intended or used to discriminate because of race, color,
> religion, sex or national origin....

*See Griggs,* 401 U.S. at 426 n. 1, 91 S.Ct. at 851 n. 1.

defendant, had a disparate impact on African-Americans because "[i]n North Carolina ..., while 34% of white males had completed high school, only 12 % of Negro males had done so." *Id.* at 430 n. 6, 91 S.Ct. at 853 n. 6. Similarly, "with respect to standardized tests, the EEOC in one case found that use of a battery of tests, including the Wonderlic and Bennett tests used by the Company in the instant case, resulted in 58% of whites passing the tests, as compared with only 6% of the blacks." *Id.* Despite this showing of disparate impact, the company continued to utilize the tests even though "neither the high school completion requirement nor the general intelligence test [was] shown to bear a demonstrable relationship to successful performance of the jobs for which it was used." *Id.* at 431, 91 S.Ct. at 853. Given these facts, the Supreme Court reversed the Fourth Circuit's holding that "a subjective test of the employer's intent should govern" Title VII analysis, *id.* at 428, 91 S.Ct. at 852, and concluded that "[u]nder the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices," *id.* at 430, 91 S.Ct. at 853. From *Griggs,* therefore, emerges the now familiar formulation of the core of a disparate impact analysis:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

*Id.* at 431, 91 S.Ct. at 853.

Since *Griggs,* Congress has codified the appropriate burdens of proof in a disparate impact case in 42 U.S.C. § 2000e-2(k) (1994), and a settled jurisprudence has arisen to implement the methodology. In the first stage of a disparate impact case, the "complaining party [must] demonstrate[ ] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i).[10] To "demonstrate" means to "meet[ ] the burdens of production and persuasion." 42 U.S.C. § 2000e(m) (1994). In other words, in order to surmount the first

---

[10]The statute also provides that "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i).

hurdle in a disparate impact race discrimination case, the plaintiff must make out a prima facie case "that [a] facially neutral employment practice ha[s] a significantly discriminatory impact." *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982). Demonstrating disparate impact in the first instance can be tricky business; it often involves ominous-sounding methods of statistical inquiry like "multiple regression analysis," *see Eastland v. TVA,* 704 F.2d 613, 621 (11th Cir.1983), "standard deviation," *see Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 995 n. 3, 108 S.Ct. 2777, 2789 n. 3, 101 L.Ed.2d 827 (1988) (plurality), and the EEOC's "four-fifths rule," *see id.* But what the plaintiff must attempt to do is show that there is a legally significant disparity between (a) the racial composition, caused by the challenged employment practice, of the pool of those enjoying a job or job benefit; and (b) the racial composition of the qualified applicant pool.[11] *See Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 650-51, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989); *Edwards v. Wallace Community College,* 49 F.3d 1517, 1520 (11th Cir.1995).

The focus during this first stage of the inquiry, and indeed during the whole of the disparate impact analysis, is on defining the qualified applicant pool. In order to determine whether an employment practice causes a "disparate" impact, the court must gain some handle on the baseline racial composition that the impact is "disparate" from; that is, what should the racial composition of the job force look like absent the offending employment practice. "[S]tatistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value." *Watson,* 487 U.S. at 997, 108 S.Ct. at 2790 (plurality). The Supreme Court has described as "nonsensical" comparisons to a baseline pool that is not adequately tailored to reflect only those potential applicants who are actually qualified for the job or job

---

[11]We include the term "job benefit" to indicate that the disparate impact analysis can be used to challenge employment practices that have a disparate impact at any level of the employment structure, from hiring to promotions to levels of compensation.

We use the term "qualified applicant pool" to indicate that the pool of potential employees from which employers should choose, absent any discrimination, may include persons who are not actual applicants for the job or job benefit at issue; by "qualified applicant pool" we mean the pool from which potential qualified applicants might come.

benefit at issue. *Wards Cove,* 490 U.S. at 651, 109 S.Ct. at 2122; *see also New York City Transit Auth. v. Beazer,* 440 U.S. 568, 585-86, 99 S.Ct. 1355, 1365-66, 59 L.Ed.2d 587 (1979) (where plaintiffs challenged city's policy of not employing persons using methadone as having a disparate impact on blacks and Hispanics, statistics indicating the racial composition of methadone users throughout the whole city "tells us nothing about the class of otherwise-qualified applicants and employees[,]" in part because "a substantial portion of the persons included in [the city-wide figures] are either unqualified for other reasons—such as the illicit use of drugs and alcohol—or have received successful assistance in finding jobs with employers other than [the defendant]"); *Maddox v. Claytor,* 764 F.2d 1539, 1549-50 (11th Cir.1985) (holding that plaintiff's statistics did not "shed any light on the legally relevant issue" because they did not indicate "the group of applicants who were interviewed, or even the group of applicants found qualified or the group of all applicants"). "To adequately assess statistical data, there must be evidence identifying the basic qualifications [for the job or job benefit at issue] and a determination, based upon these qualifications, of the relevant statistical pool with which to make the appropriate comparisons." *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1553-54 (11th Cir.1994) (discussing statistical comparison evidence in the context of county's attempt to establish compelling interest for affirmative action plan because of past discrimination).

The contest between the plaintiff and defendant is one in which both seek to answer the question of who is qualified, and thus to define the qualified applicant pool on their own terms. Definition of a qualified applicant pool will shift with the nature of the job or job benefit, and the nature of the challenged employment practice at issue. At different times, courts have found qualified applicant pools to be adequately represented by regional populations, *see International Bhd. of Teamsters v. United States,* 431 U.S. 324, 337 n. 17, 97 S.Ct. 1843, 1855-56 n. 17, 52 L.Ed.2d 396 (1977) (finding regional population figures to be probative in a pattern or practice discrimination suit), or even national population statistics, *see Dothard v. Rawlinson,* 433 U.S. 321, 329-30, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 870 (11th Cir.1986). Using population figures as a proxy for the qualified applicant pool becomes troublesome, however, "[w]hen special qualifications are required to fill particular jobs." *Hazelwood Sch.*

*Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742 n. 13 53 L.Ed.2d 768 (1977) (discussing statistical comparisons in the context of a pattern or practice case); *see also Teamsters,* 431 U.S. at 339-40 n. 20, 97 S.Ct. at 1856-57 n. 20 ("[E]vidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants would ... be relevant."); *Peightal,* 26 F.3d at 1554 ("[F]or positions requiring minimal training or for certain entry level positions, statistical comparison to the racial composition of the relevant population suffices, whereas positions requiring special skills necessitate a determination of the number of minorities qualified to undertake the particular task."). Courts have thus sometimes found helpful a showing of the racial composition of the pool of those who actually applied for a particular job or job benefit, *see Teal,* 457 U.S. at 443, 102 S.Ct. at 2528-29 (analyzing racial composition of the pool of persons who actually took written examination administered by employer); *Nash v. Jacksonville,* 905 F.2d 355, 358 (11th Cir.1990) (same), or those who were found to be actually qualified in a given geographic area, *see Hazelwood,* 433 U.S. at 308, 97 S.Ct. at 2742. But even actual applicant statistics may "not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory." *Dothard,* 433 U.S. at 330, 97 S.Ct. at 2727; *see also Wards Cove,* 490 U.S. at 651 n. 7, 109 S.Ct. at 2122 n. 7; *Kilgo,* 789 F.2d at 868.

"If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own." *Dothard,* 433 U.S. at 331, 97 S.Ct. at 2727-28. This includes evidence that the plaintiffs have simply erred in their calculations or evidence that the plaintiffs have failed sufficiently to tailor their qualified applicant pool. *See id.* at 338-39, 97 S.Ct. at 2731 (Rehnquist, J., concurring in result and concurring in part) ("If the defendants in a Title VII suit believe there to be any reason to discredit plaintiffs' statistics that does not appear on their face, the opportunity to challenge them is available to the defendants just as in any other lawsuit. They may endeavor to impeach the reliability of the statistical evidence, they may offer rebutting evidence, or they may disparage in arguments or in briefs the probative weight which the plaintiffs' evidence should be accorded."); *Peightal,* 26 F.3d at 1556-57.

The key to this first stage is to understand that the concept of a "disparate impact" on one racial group over another only makes sense if we tailor the qualified applicant pool to reflect only those applicants or potential applicants who are "otherwise qualified," *Beazer,* 440 U.S. at 585, 99 S.Ct. at 1366, (that is, qualified *but for* their failure to meet the challenged employment requirement) for the job or job benefit at issue. If the court fails to define the qualified applicant pool in an appropriately specific manner, then the challenged employment practice has not actually been shown to be "causing" any "disparate impact." Something else, unrelated to the employer's practices and procedures, may be holding back a particular racial group. An example might help clarify our rationale. Consider a community composed of equal numbers of African-Americans and whites. There are, let us say, 1,000 blacks and 1,000 whites. Now, imagine that within this community, an employer announces that it is going to hire eighty new employees, all for identical labor positions, and that it will only consider applicants who have a high school diploma. The correlation between educational attainment and race in the community breaks down as follows: 30% of the African-American segment has a high school diploma (70% does not), whereas 50% of the white segment has a high school diploma (50% does not). Now assume that 100 blacks and 100 whites apply for the eighty jobs. Their educational attainment corresponds in all respects to that of the community at large; that is, thirty of the African-Americans have a high school education, as do fifty of the whites. Citing its high school degree requirement, the employer hires the thirty blacks and the fifty whites with high school degrees.

When the seventy rejected black applicants file suit against the employer, claiming that the high school degree requirement has a disparate impact on African-Americans in violation of Title VII, the employer responds by introducing evidence that, due to unexplained population trends, 40% of the black segment of the community is under the age of 18, but all 1000 whites are age 18 or over. Further, this population figure corresponds positively with the pool of applicants for the jobs at issue; forty of the 100 black applicants were under 18 years of age, but all of the whites were 18 or over. Therefore, even if the employer discontinued its high school diploma requirement, the forty black applicants under age 18 would not have been hired because the relevant labor laws preclude hiring underage persons.

If the African-American plaintiffs continue to assert their claim of disparate impact, they would in one sense be correct. The high school education requirement certainly does have a disparate impact on blacks because more than 1.65 times as many whites as blacks have high school diplomas; therefore, 1.65 times as many whites will be hired, in a community composed of equal numbers of blacks and whites. A finding of disparate impact is only plausible in this situation, however, if one neglects to consider the qualified applicant pool. The unstated premise to the conclusion that disparate impact has reared its ugly head in this hypothetical is that because the community as a whole is composed of equal numbers of blacks and whites, the eighty employment positions should also be filled with equal numbers of blacks and whites; but this is not the case. If the employer's population evidence is credible, then the qualified applicant pool includes only 60% of the blacks (because 40% are underage), but all of the whites. What we would expect, given these facts, is that the employment outcome absent the high school requirement would mimic that produced when a high school diploma is required—over 1.65 times as many whites as blacks will be hired because over 1.65 times as many are of working age. Under these facts, it is clear that the plaintiffs have not demonstrated that the high school diploma requirement has a disparate impact in the first instance.

Once the plaintiffs have met their burden of demonstrating that a challenged employment practice causes a disparate impact, the burden shifts to the defendant employer "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).[12] Alternatively, the complaining party can demonstrate "that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in 'efficient and trustworthy workmanship.' " *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (quoting *McDonnell Douglas,* 411 U.S. at 801, 93 S.Ct. at 1823); *see* 42 U.S.C. §

---

[12]The 1991 amendments to Title VII, *inter alia,* reversed the Supreme Court's interpretation in *Wards Cove,* 490 U.S. at 659, 109 S.Ct. at 2126, where the Court held that defendants only need to meet the burden of production, but not persuasion, during the second stage of a disparate impact case. Section 2000e-2(k)(1)(A)(i) requires an employer to "demonstrate" that the challenged practice is a job related business necessity, and as noted, *supra,* to "demonstrate" means to "meet[ ] the burdens of production and persuasion." 42 U.S.C. § 2000e(m).

2000e-2(k)(1)(A)(ii). Though this second stage shifts the burden of demonstration to the defendant, the ultimate focus of the inquiry remains on the question of who should be included in the qualified applicant pool. If the employer can demonstrate that the practice at issue is a job related business necessity, then the employer has shown that there is no ultimate disparate impact; this is because the qualified applicant pool would only include those persons who could meet the employer's challenged criteria. For instance, in the above hypothetical, if we relax the assumptions with regard to age and race in the community, and posit that equal numbers of blacks and whites (say 80% of each) are of working age, then the African-American plaintiffs might be successful in carrying their prima facie burden of demonstrating that the high school diploma requirement has a disparate impact on blacks (because only 30% of blacks, as opposed to 50% of whites, have a high school education). If the employer is successful in demonstrating that a high school education is a job related business necessity for the job at issue, then what the employer has done, in effect, is to demonstrate that the requirement does not actually cause a disparate impact. A finding of business necessity is equivalent to a finding that the qualified applicant pool only includes those persons who have attained a high school degree. Likewise, if the employer failed to demonstrate business necessity, then the plaintiffs would have succeeded in proving disparate impact in the ultimate sense; this is because the qualified applicant pool would include those persons of working age who did not posses the required education.

If the court ultimately finds that the employer has violated the disparate impact provisions of Title VII, and is therefore engaged in an unlawful employment practice, the court may order a wide range of equitable relief under 42 U.S.C. § 2000e-5(g)(1)(1994).[13] Principally, the court should enjoin the employer

---

[13] 42 U.S.C. § 2000e-5(g)(1) provides:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems

from continuing the use of the challenged practice. As for individual relief, if an individual plaintiff has shown that he or she was within the class of persons negatively impacted by the unlawful employment practice, then the employer must be given an opportunity to demonstrate a legitimate nondiscriminatory reason why, absent the offending practice, the individual plaintiff would not have been awarded the job or job benefit at issue anyway. *See Stephen v. PGA Sheraton Resort, Ltd.,* 873 F.2d 276, 278-79 (11th Cir.1989); *Ross v. Buckeye Cellulose Corp.,* 733 F.Supp. 363, 377 (M.D.Ga.1990), *rev'd on other grounds,* 980 F.2d 648 (11th Cir.1993). If the employer cannot so demonstrate, then individual relief may be merited.

IV.

The Eleventh Amendment to the United States Constitution states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Amendment has been interpreted as a jurisdictional bar on the federal courts from hearing suits brought against states by their own citizens, or by citizens of other states. *See Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 507, 33 L.Ed. 842 (1890). Under *Seminole Tribe v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), Congress may abrogate a state's sovereign immunity, but it can only do so if: (a) Congress "unequivocally expressed its intent to abrogate the immunity," through "a clear legislative statement;" and (b) Congress has acted "pursuant to a valid exercise of power." *Id.* at 55, 116 S.Ct. at 1123 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) ). Defendants claim

appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

The statutory requirement that the court find that the employer has "intentionally engaged" in the unlawful employment practice does not mean that this remedial provision is only applicable in disparate treatment or pattern or practice cases. "[Section 2000e-5(g) ] requires only that the defendant meant to do what he did, that is, his employment practice was not accidental." *Local 189, United Papermakers and Paperworkers, AFL-CIO, CLC v. United States,* 416 F.2d 980, 996 (5th Cir.1969); *see also Robinson v. Lorillard Corp.,* 444 F.2d 791, 796 (4th Cir.1971). The full range of equitable remedies are available in disparate impact cases as well.

that neither prong is satisfied with regard to the disparate impact provisions of Title VII. We now address

their arguments in turn.

A.

Defendants first argue that in enacting the disparate impact provisions of Title VII, Congress failed

to express a clear legislative statement of its intent to abrogate the states' sovereign immunity. We need

address this contention only briefly. When Title VII was first enacted in 1964, its coverage was not extended

to state and local governments. In 1972, the statute was amended to include "governments, governmental

agencies, [and] political subdivisions." 42 U.S.C. § 2000e(a).[14]

*Seminole Tribe* reaffirmed the principle that Congress may abrogate the states' sovereign immunity

when acting pursuant to its Fourteenth Amendment enforcement power. *See* 517 U.S. at 65-66, 116 S.Ct. at

1128. The Fourteenth Amendment states, in relevant part:

> Section 1.... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
>
> ....

---

[14]In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 449 n. 2, 96 S.Ct. 2666, 2668 n. 2, 49 L.Ed.2d 614 (1976), the Supreme Court described the statutory change as follows:

> [T]he definition of "person" in § 701(a) of the 1964 Act, 78 Stat. 253, 42 U.S.C. § 2000e(a), was amended by § 2(1) of the Equal Employment Opportunity Act of 1972 (hereinafter the 1972 Amendments), 86 Stat. 103, 42 U.S.C. § 2000e(a) (1970 ed., Supp. IV), to include "governments, governmental agencies, [and] political subdivisions."
>
> The express exclusion of "a State or political subdivision thereof" provided in § 701(b) of the former was stricken by § 2(2) of the latter, 86 Stat. 103, 42 U.S.C. § 2000e(b) (1970 ed., Supp. IV). Section 2(5) of the 1972 Amendments, 86 Stat. 103, 42 U.S.C. § 2000e(f) (1970 ed., Supp. IV), amended § 701(f) of the 1964 Act, 42 U.S.C. § 2000e(f), to include within the definition of "employee" those individuals "subject to the civil service laws of a State government, governmental agency or political subdivision."
>
> The 1972 Amendments retained the right of an individual aggrieved by an employer's unlawful employment practice to sue on his or her own behalf, upon satisfaction of the statutory procedural prerequisites, and made clear that that right was being extended to persons aggrieved by public employers. *See* 1972 Amendments, § 4(a), 86 Stat. 104, 42 U.S.C. §§ 2000e-5(a)-(g) (1970 ed., Supp. IV).

Section 5. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

In *Fitzpatrick v. Bitzer,* the Supreme Court concluded that,

> [i]n the 1972 Amendments to Title VII of the Civil Rights Act of 1964, Congress, acting under § 5 of the Fourteenth Amendment, authorized federal courts to award money damages in favor of a private individual against a state government found to have subjected that person to employment discrimination on the basis of "race, color, religion, sex, or national origin."

427 U.S. at 447-48, 96 S.Ct. at 2667. The Court also stated that "[t]here is no dispute that in enacting the 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment." *Id.* at 453 n. 9, 96 S.Ct. at 2670 n. 9. Given this clear precedential guidance, we have no hesitation in concluding that Congress unequivocally expressed its intent to abrogate the states' Eleventh Amendment immunity when it amended Title VII to cover state and local governments.

Defendants argue that subsequent Supreme Court decisions dealing with the clarity with which Congress must express its intent to abrogate, such as *Dellmuth v. Muth,* 491 U.S. 223, 228, 109 S.Ct. 2397, 2400, 105 L.Ed.2d 181 (1989), and *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 239-40, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171 (1985), compel a reconsideration of *Fitzpatrick.* We are unable to reconsider *Fitzpatrick* since the Supreme Court has clearly held that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989)). In light of the fact that *Seminole Tribe* cited *Fitzpatrick* approvingly, we do not even think tenable the suggestion that the Supreme Court has "rejected" the reasoning in *Fitzpatrick;*[15] even if we did think

---

[15]*See Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. at 1125 (internal citations omitted), where the Supreme Court stated:

> In *Fitzpatrick,* we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution. We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the

defendants' contention had some merit, however, it is for the Supreme Court, and not us, to reconsider its own precedent.

Defendants next make the somewhat novel argument that since Congress did not codify the burdens of proof in disparate impact cases until 1991, *see* Pub.L. No. 102-166, § 105, 105 Stat. 1071, 1074 (codified at 42 U.S.C. § 2000e-2(k)), it could not have meant to subject states to disparate impact suits (as opposed to disparate treatment, or pattern or practice suits) when it amended Title VII to cover state and local governments in 1972. This argument misunderstands the evolution of the disparate impact theory. Disparate impact analysis did not spring forth anew in 1991; as discussed, *supra,* in 1971 the Supreme Court *interpreted* the original Civil Rights Act of 1964, particularly sections 2000e-2(a)(2) and (h), *see, supra,* n. 9, to prohibit "practices that are fair in form, but discriminatory in operation." *Griggs,* 401 U.S. at 431, 91 S.Ct. at 853. The Supreme Court has explicitly found that "Congress recognized and endorsed the disparate-impact analysis employed by the Court in *Griggs,*" *Teal,* 457 U.S. at 447 n. 8, 102 S.Ct. at 2531 n. 8, and that "Congress indicated [in the 1972 amendments] the intent that the same Title VII principles be applied to governmental and private employers alike." *Dothard,* 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14. There is no indication that, by enacting the 1991 amendments, Congress sought to do anything more than reaffirm and strengthen the disparate impact analysis, *see supra,* n. 12 and part II. Therefore, defendants' argument, while interesting, is meritless because it is clear that Congress has, indeed, sought to subject states to disparate impact lability under Title VII.

B.

The state next contends that even if Congress has expressed its intent to abrogate the states' Eleventh Amendment immunity, it has not acted "pursuant to a valid exercise of power." *Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. at 1123 (internal quotations omitted). Specifically, the state contends that the disparate

---

Amendment expressly provided that "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment.

impact provisions of Title VII are not a valid exercise of Congress' Fourteenth Amendment enforcement power.

i.

Our adjudication of this issue would seem to be largely foreclosed by the former Fifth Circuit's decision in *Scott v. City of Anniston,* 597 F.2d 897, 900 (5th Cir.1979),[16] in which the court held that "Title VII is unquestionably appropriate legislation to enforce the equal protection clause" and that "the 'disproportionate impact' standard [articulated in *Griggs* ] [is] an appropriate means of fulfilling those objectives." *See also Allen v. Alabama State Bd. of Educ.,* 816 F.2d 575, 577 (11th Cir.1987) (holding that "in civil actions invoking Title VII, state defendants lack eleventh amendment protection"). In *Scott,* black employees of the Public Works Department of the City of Anniston, Alabama, sued their employer claiming that certain of the city's employment practices had a disparate impact on African-Americans. The City argued, and the district court ruled, that government entities could not be made subject to disparate impact claims under Title VII because "the legislature could not by statute create a right of action subject to less stringent requirements than those imposed by that amendment alone." *Scott,* 597 F.2d at 899. Because Supreme Court decisions like *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), require plaintiffs to show that a government entity acted with discriminatory intent in order to demonstrate a Fourteenth Amendment violation, the district court in *Scott* reasoned that subjecting government agencies to disparate impact claims (which do not require a showing of discriminatory intent) was not within the congressional prerogative. The former Fifth Circuit reversed, finding that Title VII disparate impact analysis rested squarely within Congress' Section 5, Fourteenth Amendment power. *See Scott,* 597 F.2d at 900.

Defendants argue, first, that *Scott* is inapposite because the plaintiffs in *Scott* sued a municipality, a government entity not entitled to Eleventh Amendment sovereign immunity. This argument is wholly unconvincing. The question in *Scott* was essentially the same as the question of whether Congress has the

---

[16]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

power to abrogate a state's sovereign immunity under *Seminole Tribe*—that is, has Congress acted within the confines of its Section 5 power "to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment. In *Scott,* the court answered this question in the affirmative. Because we have already found that in amending Title VII to apply to state and local governments, Congress expressed its clear intent to abrogate the states' Eleventh Amendment immunity, the court's holding in *Scott* that Congress acted validly under Section 5 would seem to end our inquiry.

Perhaps sensing the tenuousness of their first argument, defendants next contend that the Supreme Court's decision in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), has so altered the constitutional landscape of what congressional acts can properly be classified as falling within Congress' Section 5, Fourteenth Amendment power, that the former Fifth Circuit's decision in *Scott* has effectively been overruled. Where precedent binding upon this court cannot be reconciled with a subsequent Supreme Court decision, we must defer to the Supreme Court. *Cottrell v. Caldwell,* 85 F.3d 1480, 1485 (11th Cir.1996); *United States v. Shenberg,* 89 F.3d 1461, 1480 n. 23 (11th Cir.1996). Therefore, we now address defendants' *City of Boerne* claim.

ii.

The question presented by defendants is whether the disparate impact scheme, as we have described it in part III, *supra,* goes so far beyond the constitutional command—that no state deny to any person the equal protection of the law—that it cannot fit within Congress' Section 5 enforcement power. In order to make out a claim of status-based discrimination in violation of the constitutional guarantee of equal protection, a plaintiff must prove that a government agent acted with "discriminatory purpose," *Davis,* 426 U.S. at 239, 96 S.Ct. at 2047;[17] the requirement of discriminatory motive "implies more than intent as volition

---

[17]*Davis* was the first case in which the Supreme Court expressly stated, "We have never held that the constitutional standard for adjudicating claims of invidious racial discrimination is identical to the standards applicable under Title VII, and we decline to do so today." *Davis,* 426 U.S. at 239, 96 S.Ct. at 2047. The plaintiffs in *Davis,* black applicants for employment as police officers by the District of Columbia, brought suit under the equal protection component of the Due Process Clause of the Fifth Amendment; they claimed that a written personnel test administered by the District of Columbia police department had a racially disparate impact on African-Americans. Had the Supreme Court held that

or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (internal citations omitted). The Supreme Court has explained that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Factors a court may consider in determining whether state action was motivated by discriminatory animus include: (1) the disparate impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; and (4) the legislative or administrative history. *See id.* at 266-68, 97 S.Ct. at 564-65.

Under *City of Boerne,* it is clear that when Congress is acting pursuant to its Section 5 enforcement authority, it does not have the power to alter the "substance of the Fourteenth Amendment's restrictions on the States." *City of Boerne,* 521 U.S. at 519, 117 S.Ct. at 2164. In the equal protection context, this means that the core congressional motivation must remain consistent with the notion that what the Constitution prohibits is *intentional* discrimination on the part of state actors (and not state action that leads to a merely discriminatory result). In *City of Boerne,* Congress had enacted the Religious Freedom Restoration Act (RFRA) in direct response to the Court's decision in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Court concluded that consistent with the Free Exercise Clause, a state may apply neutral, generally applicable laws to religious practices even when those laws are not supported by a compelling government interest. With RFRA, Congress sought to supplant the Court's interpretation with one more favorable to religious interests. The Act attempted to "overrule" *Smith* by mandating that neutral laws that substantially burden religious exercise must

---

plaintiffs using constitutional equal protection analysis to attack allegedly discriminatory state action need not demonstrate a discriminatory purpose, but only a disparate impact, then every state action having a disparate impact on a particular racial group would have become subject to the Court's strict scrutiny, "the most demanding test known to constitutional law." *City of Boerne,* 521 U.S. at 534, 117 S.Ct. at 2171.

be justified under the compelling government interest test. *See City of Boerne,* 521 U.S. at 512-15, 117 S.Ct. at 2160-62.

The Court concluded that Congress had acted beyond the scope of its Fourteenth Amendment enforcement power:

> Congress' power under § 5 ... extends only to enforcing the provisions of the Fourteenth Amendment. The Court has described this power as "remedial." The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of the Fourteenth Amendment."

*City of Boerne,* 521 U.S. at 519, 117 S.Ct. at 2164 (internal citations omitted). The Court emphasized that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional," *id.* at 518, 117 S.Ct. at 2163, but "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect," *id.* at 520, 117 S.Ct. at 2164.

With RFRA, Congress overstepped its bounds with regard to both the "injury" it sought to prevent, and the "means" it adopted to that end. As for the "injury" to be prevented, the legislature failed to demonstrate any recent history of an injury to the free exercise rights of religious practitioners that rose to the level of a constitutional violation. *See id.* at 530, 117 S.Ct. at 2169 ("RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry. The history of persecution in this country detailed in the hearings mentions no episodes occurring in the past 40 years."). With regard to the "means" adopted, Congress prohibited government interference with religious exercise in such a sweeping and drastic manner that the Act simply "[could] not be considered remedial, preventive legislation, if those terms are to have any meaning." *Id.* at 532, 117 S.Ct. at 2170. As to what a plaintiff class of religious observers would have to prove in a case brought under the Act, "RFRA's substantial burden test

... [was] not even a discriminatory effects or disparate impact test." *Id.* at 535, 117 S.Ct. at 2171. Plaintiffs might be able to bring suit "[w]hen the exercise of religion ha[d] been burdened in an incidental way by a law of general application." *Id.* Once substantial burden was shown, "the State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest.... Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *Id.* at 534, 117 S.Ct. at 2171.

Defendants contend that, like RFRA, the disparate impact provisions of Title VII are so out of line with the constitutional harm to be remedied that they cannot be sustained under Congress' Fourteenth Amendment enforcement power. They point out that demonstrating disparate impact does not require a plaintiff to show that the employer was motivated by a discriminatory purpose. In order to prove an equal protection violation, however, a plaintiff must demonstrate discriminatory intent, "that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney,* 442 U.S. at 279, 99 S.Ct. at 2296. It is true that the disparate impact analysis does not require plaintiffs to demonstrate a subjective discriminatory motive on the part of the decisionmaker; but neither this court, nor the Supreme Court, has ever held that the issue of intent is wholly irrelevant to a claim of disparate impact. "The distinguishing features of the factual issues that typically dominate in disparate impact cases do not imply that the ultimate legal issue is different than in cases where disparate treatment analysis is used." *Watson,* 487 U.S. at 987, 108 S.Ct. at 2785. This is because the disparate impact analysis was designed as a "prophylactic" measure, *Teal,* 457 U.S. at 449, 102 S.Ct. at 2531; *Albemarle Paper,* 422 U.S. at 417, 95 S.Ct. at 2371, to get at "[d]iscrimination [that] could actually exist under the guise of compliance with [Title VII]." *Griggs,* 401 U.S. at 435, 91 S.Ct. at 855-56 (quoting 110 Cong. Rec. 13504 (remarks of Sen. Case) ) (internal quotations omitted); *see also Watson,* 487 U.S. at 990, 108 S.Ct. at 2786-87 (finding that "even if one assumed that [discrimination through subjective employment criteria] can be adequately policed through disparate treatment analysis, the problem of subconscious

stereotypes and prejudices would remain"); Charles R. Lawrence III, "The Id, the Ego, and Equal Protection: Reckoning With Unconscious Racism," 39 *Stan. L.Rev.* 317 (1987).

In a Title VII race discrimination disparate impact case, the plaintiff carries the prima facie burden of demonstrating to a court that a particular employment practice disproportionately burdens one racial group over another. As we described in our analysis in part III, *supra,* making out the prima facie case is not always such an easy thing to do. The plaintiff is forced to tailor her qualified applicant pool to represent only those applicants or potential applicants who are otherwise-qualified (but for the challenged employer practice) for the job or job benefit at issue. We emphasize the importance of this tailoring function because if the qualified applicant pool is adequately narrowed by the interaction between the plaintiff and defendant during the first stage of the analysis, then a prima facie finding of disparate impact by the court means that the plaintiff has demonstrated that the challenged practice (and not something else) actually *causes* the discriminatory impact at issue. Though the plaintiff is never explicitly required to demonstrate discriminatory motive, a genuine finding of disparate impact can be highly probative of the employer's motive since a racial "imbalance is often a telltale sign of purposeful discrimination." *Teamsters,* 431 U.S. at 339-40 n. 20, 97 S.Ct. at 1856-57 n. 20; *see also Davis,* 426 U.S. at 253, 96 S.Ct. at 2054 (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds."). If, after a prima facie demonstration of discriminatory impact, the employer cannot demonstrate that the challenged practice is a job related business necessity, what explanation can there be for the employer's continued use of the discriminatory practice other than that some invidious purpose is probably at work? In our race hypothetical in part III, *supra,* if the court found that the employer could not demonstrate that its high school diploma requirement was a job related business necessity, why would the employer continue to require a high school education when it is aware of the practice's discriminatory impact

on African-Americans?[18]  In the context of the plaintiff's further option of demonstrating an alternative employment practice that has a less discriminatory impact, the Supreme Court has been even more unambiguous in characterizing an employer's refusal to adopt the alternative practice as "evidence that the employer was using its tests merely as a 'pretext' for discrimination." *Albemarle Paper,* 422 U.S. at 425, 95 S.Ct. at 2375; *see also Teal,* 457 U.S. at 447, 102 S.Ct. at 2530 (even where employer demonstrates that a challenged practice is a job related business necessity, "the plaintiff may prevail, if he shows that the employer was using the practice as a mere pretext for discrimination").

All of this is not to say that the plaintiff is ever required to prove discriminatory intent in a disparate impact case; it is clear that what plaintiffs must demonstrate is a discriminatory result, coupled with a finding that the employer has no explanation as to why the challenged practice should be sustained as a job related business necessity.  What our analysis does show, however, is that the disparate impact provisions of Title VII can reasonably be characterized as "preventive rules" that evidence a "congruence between the means used and the ends to be achieved."  *Id.* at 530, 117 S.Ct. at 2169.  Congress has not sought to alter the "substance of the Fourteenth Amendment's restrictions on the States" with the disparate impact provisions of Title VII. *City of Boerne,* 521 U.S. at 519, 117 S.Ct. at 2164.  Our analysis of the mechanics of a disparate impact claim has led us unavoidably to the conclusion that although the form of the disparate impact inquiry differs from that used in a case challenging state action directly under the Fourteenth Amendment, the core injury targeted by both methods of analysis remains the same:  intentional discrimination.

Further, as to the "means" used, we note that the Supreme Court found in *Boerne* that RFRA's substantial burden test was "not even a discriminatory effects or disparate impact test." *Id.* at 535, 117 S.Ct.

---

[18]In our hypothetical, the employer's continuing use of the high school education requirement would seem particularly probative of discriminatory intent, since the wages for an employee who did not have a high school degree would, necessarily, be lower;  such an employee would possess less human capital with which to bargain.  If the employer could not demonstrate that the high school diploma requirement was a job related business necessity, then retention of the requirement would be inefficient since this non-necessary employee attribute will cost more in terms of higher wages that the employer will have to pay to employees holding a high school diploma.  The employer in this scenario, therefore, would appear to be indulging his "taste" for discrimination.  *See* Gary S. Becker, *The Economics of Discrimination* 153-54 (2d ed.1971).

at 2171. And if a complainant could demonstrate a substantial burden on a religious practice, then the government was automatically saddled with the responsibility of demonstrating that the challenged government act was justified by a compelling interest, and that it was the least restrictive means of furthering that interest. Under the disparate impact provisions of Title VII, by contrast, plaintiffs are required to demonstrate that a particular employment practice has an actual discriminatory impact; and even then, employers are not required to show that they have some "compelling interest" in continuing to use the practice, or that they have adopted the "least restrictive means" of furthering their "compelling interest." They must merely "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). However difficult this may have proven to be in some cases, demonstrating business necessity is certainly on an entirely different evidentiary planet than demonstrating a compelling interest; it is a rare day, indeed, that courts find government actors to have adequately demonstrated a compelling interest, and a rarer one still that courts find no less restrictive alternatives to be available.

Finally, we need not dredge up this nation's sad history of racial domination and subordination to take notice of the fact that the "injury" targeted by Title VII, intentional discrimination against racial minorities, has since our inception constituted one of the most tormenting and vexing issues facing this country. There can be little doubt that the core motivation animating the Fourteenth Amendment's Equal Protection Clause was a concern for protecting the rights of racial minorities subject to historical discrimination, *see* Alexander Bickel, "The Original Understanding and the Segregation Decision," 69 *Harv. L.Rev.* 1 (1955), and that Congress is acting most comfortably under the Amendment when it is acting to cure racial prejudice. *See Strauder v. West Virginia,* 100 U.S. (10 Otto) 303, 306-07, 25 L.Ed. 664 (1880). The House Report accompanying the 1972 amendments to Title VII, extending coverage to state and local governments, documented the troubling persistence of race discrimination in public employment:

> In a report released in 1969, the U.S. Commission on Civil Rights examined equal employment opportunity in public employment in seven urban areas located throughout the country—North as well as South. The report's findings indicate that widespread discrimination against minorities exists in State and local government employment, and that the existence of this discrimination is

perpetuated by the presence of both institutional and overt discriminatory practices. The report cites widespread perpetuation of past discriminatory practices through *de facto* segregated job ladders, invalid selection techniques, and stereotyped misconceptions by supervisors regarding minority group capabilities. The study also indicates that employment discrimination in State and local governments is more pervasive than in the private sector. The report found that in six of the seven areas studied, Negroes constitute over 70 percent of the common laborers, but that most white-collar jobs were found to be largely inaccessible to minority persons. For example, in Atlanta and Baton Rouge, there were no blacks in city managerial positions.

In another report issued by the U.S. Commission on Civil Rights in 1970, *Mexican Americans and the Administration of Justice in the Southwest,* the Commission found, on the basis of a 1968 survey, that in the law enforcement agencies and district attorneys' offices in the five Southwestern States, Mexican Americans were generally underrepresented in proportion to their demographic distribution. The statistics in this report show that in the Southwestern States Mexican Americans, who constitute approximately 12 percent of the population, account for only 5.2 percent of police officers and 6.11 percent of civilian employers [sic] with law enforcement agencies.

The problem of employment discrimination is particularly acute and has the most deleterious effect in these governmental activities which are most visible to the minority communities (notably education, law enforcement, and the administration of justice) with the result that the credibility of the government's claim to represent all the people equally is negated.

H.R.Rep. No. 92-238 (1972), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2152-53. The means used by Congress in the disparate impact provisions of Title VII, so closely aligned to the constitutional equal protection analysis, are neither incongruent with the purpose of preventing intentional discrimination in public employment, nor disproportionate to the injury to be avoided.

V.

For the foregoing reasons, we conclude that in enacting the disparate impact provisions of Title VII, Congress has unequivocally expressed its intent to abrogate the states' Eleventh Amendment sovereign immunity, and that Congress has acted pursuant to a valid exercise of its Fourteenth Amendment enforcement power. We, therefore, AFFIRM the district court's denial of defendants' Rule 12(b)(1) motion to dismiss all disparate impact claims against the State of Alabama, based on the state's claim to sovereign immunity under the Eleventh Amendment.

AFFIRMED.